RICKWALT v RICHFIELD LAKES CORPORATION

Docket No. 210591. Submitted December 8, 2000, at Detroit. Decided June 15, 2001, at 9:20 A.M.

Patricia Rickwalt, as personal representative of the estate of Willard Rickwalt, brought an action in the Genesee Circuit Court against Richfield Lakes Corporation, alleging wrongful death concerning the decedent's drowning at the defendant's vacation resort. A jury returned a verdict and award of damages for the plaintiff. The court, Duncan M. Beagle, J., entered judgment on the verdict and also awarded the plaintiff interest and costs. The defendant appealed.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion in admitting the testimony of the plaintiff's expert on drowning prevention and lifeguard training. The witness, a well-recognized expert on water safety with twenty to thirty years of training and experience, offered comments, observations, and opinions concerning which one of three categories of drowning victims the decedent fit into and concerning whether the defendant's lifeguards were properly stationed at the time of the decedent's drowning. The witness' testimony was supported by his extensive training and experience, as well as the evidence in the record.

2. The trial court did not err in refusing the defendant's request for a jury instruction on comparative negligence. The record, which contained no evidence of medical advice against swimming or other recreational activities in light of the decedent's cardiac health, did not support a comparative negligence instruction. Furthermore, such an instruction would have conflicted with the well-established principle that a defendant takes a plaintiff as he finds him.

3. The trial court did not err with respect to its jury instructions regarding pain and suffering and damages for pain and suffering. There was evidence from which the jury could infer pain and suffering endured by the decedent while drowning.

4. Even in the absence of testimony from the decedent's daughter and siblings, the trial court did not err in instructing the jury that it could find that these relatives of the decedent suffered damages;

other relatives of the decedent provided evidence of the decedent's relationship with his daughter and siblings.

5. The trial court did not err in instructing the jury that it could consider the standard mortality table when determining life expectancy and damages. The court did not instruct the jury that it had to adhere to the mortality table despite evidence of the decedent's medical problems; instead, the court advised the jury that it could consider the mortality table with all the other evidence in determining life expectancy.

6. The trial court did not err in refusing to instruct the jury that the death certificate constituted only prima facie evidence of the decedent's cause of death. An instruction concerning hospital records should be given only if necessary to accurately state the relevant law and other instructions do not accurately cover the point. Even assuming the necessity of the defendant's proposed instruction for stating the applicable law, the trial court's other instructions adequately informed the jury that it had the duty to determine the facts upon consideration of all the evidence admitted during trial.

7. The defendant's claim that the jury verdict was against the great weight of the evidence was not raised in the trial court in a motion for a new trial. The claim therefore has been waived.

8. The trial court abused its discretion in awarding the plaintiff costs for seven depositions that were not filed in the clerk's office. MCL 600.2549 provides that reasonable and actual fees for witness depositions shall not be allowed in the taxation of costs if the depositions have not been filed in the clerk's office.

9. The trial court considered and weighed the reasonableness of the plaintiff's requested expert witness fees and therefore did not abuse its discretion in making an award for the expert's trial preparation and testimony, which award was less than the amount requested by the plaintiff.

10. The trial court erred in awarding the plaintiff interest on the jury's award of future damages for loss of society and companionship. MCL 600.6013(1) provides that for complaints filed on or after October 1, 1986, interest shall not be allowed on future damages from the date of the filing of the complaint to the date of the entry of the judgment. MCL 600.6301(a) defines "future damages" as damages arising from personal injury that the trier of fact finds will accrue after the damage findings are made, and MCL 600.6301(b) defines "personal injury" as bodily harm, sickness, disease, death, or emotional harm resulting from bodily injury. The instant damages for loss of society and companionship that the jury awarded for the period of the anticipated posttrial life of the decedent con-

stituted future damages under § 6301, for which subsection 6013(1) does not allow interest.

Verdict affirmed; awards of costs for seven depositions and interest on future damages for loss of society and companionship reversed; case remanded for recalculation of interest.

1. WITNESSES — EXPERT WITNESSES.

The qualification of a witness as an expert and the admission of the witness' testimony will not be reversed on appeal absent an abuse of discretion by the trial court; the trial court may qualify a witness as an expert if it determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; the facts and data on which the expert relies in formulating an opinion must be reliable.

2. COURTS — JURY INSTRUCTIONS — APPEAL.

Jury instructions are reviewed on appeal in their entirety to determine whether the instructions given adequately informed the jury regarding the applicable law reflecting and reflected by the evidentiary claims in the particular case.

3. DEATH — WRONGFUL DEATH — PAIN AND SUFFERING.

Pain and suffering may be inferred from other evidence that does not explicitly establish the fact.

4. DEATH — WRONGFUL DEATH — DAMAGE CLAIMANTS — FAILURE TO OFFER TESTIMONY.

The failure of a person claiming damages in an action for wrongful death to offer testimony regarding loss does not preclude recovery by the claimant where there is objective evidence of the claimant's relationship with the decedent.

5. COSTS — DEPOSITIONS.

Reasonable and actual fees for witness depositions may not be awarded as costs if the depositions have not been filed in the court clerk's office (MCL 600.2549).

6. DEATH — WRONGFUL DEATH — DAMAGES — FUTURE DAMAGES FOR LOSS OF SOCIETY AND COMPANIONSHIP — INTEREST.

Interest may not be awarded for future damages for loss of companionship and society in an action for wrongful death (MCL 600.6013[1], 600.6301[a], [b]).

*MacAloon, Feldman & Weingarden* (by *Donald J. MacAloon*) (*Bendure & Thomas* by *Victor S. Valenti*, of counsel), for the plaintiff.

*Henneke, McKone, Fraim & Dawes, P.C.* (by *Edward G. Henneke*), for the defendant.

Before: SAWYER, P.J., and JANSEN and GAGE, JJ.

GAGE, J. This wrongful death action arises from the drowning death of plaintiff's decedent at defendant's vacation resort. The decedent, who was sixty-six years of age at the time of his death, went swimming with two grandchildren early one evening in August 1995. Notwithstanding that ten to fifteen individuals were present on defendant's beach, the decedent drowned, unnoticed by anyone, including defendant's on-duty lifeguards. The decedent's body was discovered just below the water surface, approximately fifteen feet from shore and almost directly in front of defendant's two lifeguards. After an eight-day trial, the jury found that defendant negligently and proximately caused plaintiff's decedent's death, and awarded plaintiff $410,000 in total damages. The trial court further awarded plaintiff $6,065.83 in taxable costs, and $71,363.97 in interest. Defendant appeals as of right. We affirm the jury's verdict, reverse in part the trial court's awards of costs and interest, and remand.

I

Defendant first contends that no factual basis supported many of the opinions offered by plaintiff's expert, Frank Pia, and that the trial court therefore erred in permitting Pia's testimony.

Absent an abuse of discretion, the qualification of a witness as an expert and the admissibility of his testimony will not be reversed on appeal. The trial court may qualify a witness as an expert if it determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. The facts and data on which the expert relies in formulating an opinion must be reliable. [*Anton v State Farm Mut Automobile Ins Co*, 238 Mich App 673, 677; 607 NW2d 123 (1999) (citations omitted).]

See also MRE 702-705. With respect to the trial court's evidentiary rulings, an abuse of discretion exists "only if an unprejudiced person, considering the facts on which the trial court acted, would say that there was no justification or excuse for the ruling made." *Berryman v K mart Corp*, 193 Mich App 88, 98; 483 NW2d 642 (1992), quoting *Gore v Rains & Block*, 189 Mich App 729, 737; 473 NW2d 813 (1991).

Pia testified that he provided consulting services involving drowning prevention and lifeguard training, as part of Water Safety Films, Inc., which also produced and distributed lifeguard training movies.[1] Beginning in 1959, Pia worked for twenty-one summers as a lifeguard watching Orchard Beach in the Bronx, New York. Pia eventually achieved the beach's chief lifeguard position, which involved training other lifeguards. According to Pia, crowds of between 150,000 to 200,000 visited Orchard Beach at a time, and beach lifeguards rescued approximately 2,000 swimmers each summer. While working at the beach, Pia conducted original research that uncovered certain predictable behavior of drowning swimmers. Pia's research, which included filming drowning

---

[1] Pia also taught and counseled at-risk teenagers.

swimmers at Orchard Beach, led him to conclude that drowning swimmers of all ages and sizes and genders exhibited certain behavior and movements characteristic of an instinctive drowning response and that drownings usually resulted from lifeguards' failure to recognize this behavior or from the lifeguards' inattentiveness. Pia wrote many articles, produced films, and lectured to numerous national and international organizations, including the American Red Cross and United States Coast Guard, regarding his water safety research and lifeguard training. Pia authored three chapters of the American Red Cross' current "Lifeguarding Today" textbook, and other researchers had duplicated and verified Pia's observation of the instinctive drowning response. Pia created two new drowning victim classifications, the distressed swimmer and the active drowning victim, in addition to a preexisting category of passive drowning victim. Pia explained that (1) distressed swimmers experienced some difficulty swimming that prevented their return to safety, but still could keep their heads above water and wave or call for help, (2) actively drowning individuals were unable to support themselves in water, exhibited the instinctive drowning response, could not wave, and, because of suffocation, could not cry for help; (3) passive drowning victims passed out in the water for physiological reasons and simply floated face down without indicating a struggle.

A

Defendant does not specifically contest Pia's water safety expertise, but instead essentially submits that no facts of record supported Pia's conclusion that the decedent fell into the active drowning victim cate-

gory. It appears undisputed that while approximately ten to fifteen people besides defendant's two lifeguards were present on the beach near the time of the decedent's drowning, no witnesses observed the decedent go under the water or heard any indication of the decedent's distress. Defendant therefore theorized at trial that the decedent must have been a passive drowning victim, who quickly and quietly submerged below the water undetected by defendant's lifeguards. To the contrary, however, Pia believed that the decedent was an active drowning victim because the decedent's medical records indicated that the decedent nearly drowned,[2] not that the decedent first experienced cardiac arrest in the water. Therefore, the death certificate findings ruled out the physiological causes of passive drowning.[3] Pia explained that because in his experience active drowning victims gripped by the instinctive drowning response were

---

[2] "Near drowning" signified that the decedent was submerged in the water, but was brought out and survived beyond a twenty-four-hour period.

[3] We disagree with defendant's suggestion that Pia, beyond the scope of his expertise, improperly analyzed, interpreted, or vouched for the accuracy of the decedent's medical records. The decedent's death certificate plainly states the cause of death as "myocardial infarction due to (or as a consequence of) near-drowning," and Pia simply and properly relied on this plain statement of record in formulating his opinion that the decedent was not a passive drowning victim.

We also reject defendant's argument that Pia engaged in improper medical speculation when he opined how the decedent would have behaved in the water if he had experienced breathing difficulties or heart stoppage. Pia testified that *in his experience, education, and training* a swimming heart attack victim would "float on the surface of the water and then slowly go under" as the air present in the swimmer's lungs escaped, and that the decedent would have displayed the instinctive drowning response if he had experienced trouble breathing. We note that defendant's cardiology expert also testified that the rate at which a floating swimmer who experienced cardiac arrest would sink in the water "is dependent upon the relationship of . . . their lung volume to the body mass."

suffocating and consequently could not call for help, the lack of any witnesses to signs of struggle by the decedent did not necessarily signify that no struggle in fact occurred.[4]

B

Defendant also argues that the record did not support Pia's conclusion that defendant's lifeguards negligently failed to detect the decedent's drowning. Pia opined that defendant's lifeguards "should have recognized [the decedent's] instinctive drowning response and made a rescue before he submerged," but failed to observe the decedent because they were inattentive and improperly stationed. It was undisputed at trial that the decedent's drowning occurred approximately fifteen feet from shore almost directly before the lifeguards and that no one witnessed the event. Four witnesses indicated that the lifeguards were sitting on picnic tables either talking to each other or watching both the water and a group of young men playing football on the beach near the time one of the young men discovered the decedent's body just below the surface of the water. Furthermore, even the lifeguards acknowledged that only moments before discovery of the decedent's body they were distracted while watching and disciplining the group of young men playing football.

---

[4] Pia testified that in his experience, nearly all suffocating drowning victims who could not yell for help went unnoticed by surrounding swimmers who failed to recognize the instinctive drowning response and were completely unaware that a drowning was happening. Pia further explained that on the basis of his previous observations, "Unless you have been specifically trained to understand what the drowning person is trying to do, it looks as though the person might be playing in the water."

C

Defendant lastly challenges as without factual foundation Pia's conclusion that the lifeguards were not properly stationed at the time of the decedent's drowning. Pia opined that at the time of the drowning the lifeguards should have been watching the water from the lifeguard towers at the beach because their positions on picnic tables did not afford an adequate vantage point for providing zoned coverage of the swimming area. The lifeguards' supervisor similarly testified at trial that both lifeguards sitting on a picnic table could not effectively scan the swimming area and that the lifeguard towers provided a better view than the ground for scanning the water and helped to minimize distractions. Furthermore, one of the lifeguards acknowledged that an elevated view of the water facilitated the sighting of a submerged body. Although the other lifeguard denied at trial that the tower would have provided her a better view of the water, this testimony was impeached with the lifeguard's prior statement that the higher view from the tower would have eliminated the distraction of the football players' presence in front of her. While defendant emphasizes that Pia did not visit the beach where the drowning occurred, we note that Pia need not have visited or measured the accident scene as a prerequisite to offering his opinion. Any perceived deficiency associated with Pia's failure to visit and personally inspect the scene affected only the weight of his testimony, not its admissibility. *Berryman, supra* at 99.

In summary, Pia was a well-recognized water safety expert with twenty to thirty years of training and

experience, whose opinions provided for the jury's consideration some insight regarding the nature of various types of drowning and whether defendant's lifeguards should have rescued the decedent. MRE 702, 704. After carefully reviewing the record, we find that Pia's comments, observations, and opinions were supported by his extensive training and experience, as well as facts that, although contested, were part of the evidentiary record. MRE 703. We conclude that the trial court did not abuse its discretion in admitting Pia's testimony. *Anton, supra; Berryman, supra* at 98.

II

Defendant next argues that the trial court erred in failing to read to the jury certain standard and non-standard jury instructions that defendant requested and in utilizing a special verdict form embodying its erroneous rulings. We review jury instructions in their entirety to determine whether the instructions given adequately informed the jury regarding the applicable law reflecting and reflected by the evidentiary claims in the particular case. *Walker v Flint*, 213 Mich App 18, 20; 539 NW2d 535 (1995).

A

Defendant first asserts that the trial court improperly refused its requested comparative negligence instruction. Defendant sought the jury's instruction regarding the decedent's comparative negligence because the decedent went swimming while suffering a known heart condition. The decedent had a heart attack and underwent quintuple bypass surgery

approximately six years before his swimming accident. While defendant's cardiology expert opined that the decedent's medical records reflected that the decedent experienced postsurgery (1) progressive heart damage due to occlusion of certain blood vessels and (2) multifocal ventricular arrhythmias, the combination of which likely resulted in the decedent's occasional shortness of breath, defendant introduced absolutely no evidence tending to establish that the decedent was advised that his medical condition prevented him from safely engaging in swimming or other recreational activities.[5] Because the record did not support a comparative negligence instruction, the trial court did not err in refusing to read such an instruction. *Bordeaux v Celotex Corp*, 203 Mich App 158, 169; 511 NW2d 899 (1993). Furthermore, a comparative negligence instruction in this case would have conflicted with the well-established principle, which the trial court properly included in its instructions, that a defendant takes a plaintiff as he finds him. See *Wilkinson v Lee*, 463 Mich 388, 396-397; 617 NW2d 305 (2000).

B

Defendant also challenges the court's instruction concerning conscious pain and suffering, alleging that no evidence demonstrated that the decedent endured any pain or suffering. While defendant's medical

---

[5] The cardiology expert also noted the mention within the decedent's medical records of chronic obstructive pulmonary disease, "the kind of lung problems that can cause wheezing and is frequently due to long-term smoking." Again, however, no evidence showed that anyone advised the decedent that he should avoid recreational activities because of this condition.

expert opined that the decedent died suddenly of cardiac arrest, other evidence, including the decedent's hospital records, indicated drowning as the primary cause of death. Pia testified that adult victims of drowning might struggle in the water for between twenty and sixty seconds before succumbing. Both lifeguards testified that after the decedent was retrieved from the water they placed the decedent on his side, causing him to expel water. The lifeguards' testimony suggests that the decedent consciously aspirated some water. In light of this evidence from which the jury could infer some measure of pain and suffering endured by the decedent while he drowned, we conclude that the trial court correctly instructed the jury regarding damages for pain and suffering. See *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 180-181; 475 NW2d 854 (1991) (noting that "pain and suffering may be inferred from other evidence that does not explicitly establish the fact," including that the decedent had sand clogging his breathing passages and died of suffocation).

C

Defendant further asserts that no evidence established that the decedent's daughter and siblings suffered damages and that the trial court therefore incorrectly instructed the jury that it could find such damages. Defendant concedes that the decedent's daughter and siblings are persons entitled to recover damages for the decedent's wrongful death, MCL 600.2922(3)(a), but suggests that in this case the daughter and siblings may not recover because they did not testify at trial regarding the extent of their damages. The decedent's son described at trial, how-

ever, the decedent's daughter's participation in the difficult decisions to remove the decedent's life support and to place their mother in a nursing home. The decedent had been his wife's caretaker. The son's testimony revealed that the decedent's youngest sister also assisted in caring for the decedent's wife, and that the decedent's siblings came from Michigan, Virginia, and California to attend decedent's funeral. The decedent's wife and son testified that plaintiff had very close family relationships, especially with his grandchildren, and enjoyed outdoor activities with family. We find the trial court's inclusive reference, when instructing the jury to determine damages, to the decedent's daughter and siblings appropriate given this evidence of the decedent's relationship with his family, including his daughter and siblings. *McTaggart v Lindsey*, 202 Mich App 612, 616; 509 NW2d 881 (1993). When some objective evidence of an eligible claimant's relationship with a decedent exists in a wrongful death action, the claimant's failure to himself offer testimony regarding his loss does not preclude the claimant's recovery. *Berryman, supra* at 97.[6]

D

Defendant additionally contends with respect to the trial court's instructions that the court should not have permitted the jury to consider the standard mortality table when calculating damages. Defendant sug-

---

[6] Although this Court in *Berryman, supra* at 94-97, considered a loss of consortium claim by the husband of the injured party, we detect no reason to distinguish this Court's analysis in *Berryman* regarding the sufficiency of proof with respect to a spouse's loss of consortium claim from loss of companionship and society claims by other relatives.

gests that the mortality table, which reflects the average life spans of generally healthy individuals, was irrelevant in this case because the decedent suffered various significant medical conditions. Our review of the record indicates that the decedent undisputedly had at least some medical conditions that would tend to shorten his life expectancy.[7] The trial court did not instruct the jury that it must adhere to the mortality table, however, but advised the jury that "this mortality table may be considered with all the other evidence in determining life expectancy." We detect no error in this instruction. Moreover, in light of the jury's award of future damages for only seven years, instead of the approximately twelve years of life that the mortality table anticipated for an individual nearly sixty-seven years of age, we conclude that even if the jury's consideration of the mortality table was inappropriate, our affirmance of the award would be consistent with substantial justice. *Winiemko v Valenti*, 203 Mich App 411, 418; 513 NW2d 181 (1994).

E

We further note that the trial court did not err in refusing to instruct the jury that the death certificate constituted only prima facie evidence of the decedent's cause of death. An instruction concerning hospital records should be given only if necessary to accurately state the relevant law and other instructions do not adequately cover the point. See *Powell v*

---

[7] For example, defendant's cardiology expert opined that the decedent's "life expectancy was limited because of his documented heart disease and progression of heart disease." The expert could not specify, however, regarding the extent of the decedent's resulting life expectancy.

*St John Hosp*, 241 Mich App 64, 78; 614 NW2d 666 (2000), citing MCR 2.516(D)(3).[8] Even assuming the necessity of defendant's proposed instruction for stating the applicable law, we find after reviewing the record that the trial court's other instructions adequately informed the jury that it had the duty to determine the facts on consideration of *all* the evidence admitted during trial. We therefore conclude that the trial court did not err in refusing to give the requested instruction. *Powell, supra.*

III

Defendant next argues that the jury's verdict was against the great weight of the evidence. Because defendant did not raise this issue in a motion for a new trial before the trial court, this issue has been waived. *Buckeye Marketers, Inc v Finishing Services, Inc*, 213 Mich App 615, 616-617; 540 NW2d 757 (1995), mod on other grounds 453 Mich 924 (1996).

IV

Defendant also challenges the propriety of certain taxable costs awarded by the trial court.

---

[8] Regarding hospital and business records, SJI2d 4.12 "recommends that no instruction be given concerning" these records. MCR 2.516(D)(3) provides as follows:

Whenever the SJI committee recommends that no instruction be given on a particular matter, the court shall not give an instruction on the matter unless it specifically finds for reasons stated on the record that

(a) the instruction is necessary to state the applicable law accurately, and

(b) the matter is not adequately covered by other pertinent standard jury instructions.

A

Defendant asserts that the trial court erred in allowing plaintiff costs for seven depositions not read into evidence.[9] The power to tax costs is wholly statutory. *Portelli v I R Constr Products Co, Inc*, 218 Mich App 591, 605; 554 NW2d 591 (1996). The relevant statute provides for an award of deposition costs under the following, limited circumstances:

> Reasonable and actual fees paid for depositions of witnesses filed in any clerk's office and for the certified copies of documents or papers recorded or filed in any public office shall be allowed in the taxation of costs only if, at the trial or when damages were assessed, the depositions were read in evidence, except for impeachment purposes, or the documents or papers were necessarily used. [MCL 600.2549.]

In this case, the parties apparently do not dispute that plaintiff filed notices of the takings or completions of the seven depositions at issue, but that plaintiff did not file with the trial court clerk the seven depositions themselves. Because § 2549 plainly and unambiguously demands that the cost of a deposition may not be taxed when the deposition has not been filed in a court clerk's office, we conclude that the trial court abused its discretion in awarding plaintiff $1,819.83 in costs for the seven depositions at issue.

---

[9] The deposition of Ryan Phillips was filed with the clerk and read into evidence, and the trial court's award of costs for this deposition is not in dispute. The trial court's challenged award of deposition costs involves the depositions of David Rapacz, Tim Rapacz, Colleen Hopkins, Cathy Nichols, Kevin Pierce, Dr. Daniel T. Anbe and Frederick Carter. These depositions were not read into the record other than for impeachment purposes.

*Elia v Hazen,* 242 Mich App 374, 381-382; 619 NW2d 1 (2000); *Portelli, supra* at 604.

B

Defendant next claims that the trial court erred in awarding plaintiff as an element of costs excessive expert witness fees. MCL 600.2164(1) authorizes a trial court to award expert witness fees as an element of taxable costs. We review for abuse of discretion the trial court's determination to award expert witness fees. *Detroit v Lufran Co,* 159 Mich App 62, 66; 406 NW2d 235 (1987); *Gundersen v Village of Bingham Farms,* 1 Mich App 647, 649; 137 NW2d 763 (1965).

Plaintiff sought reimbursement of $5,184.80 for Pia's expert witness fees. Although we failed to locate within the trial court record any itemized explanation of Pia's charges, the record of the December 22, 1997, hearing regarding costs indicated that an itemized bill was presented to the trial court and that the parties argued regarding the propriety of specific items within the bill. For example, the parties discussed the amounts of time Pia spent preparing for his deposition testimony, establishing a case file, reviewing deposition testimony and his notes, reconstructing the drowning, reviewing the mediation summaries, and preparing questions, and also argued regarding the reasonableness of Pia's hourly rates for trial preparation and testimony. In its opinion and order, the trial court indicated that it considered the breakdown of Pia's charges, ultimately finding appropriate the requested amounts of time Pia spent preparing for his testimony and trial, but reducing the requested hourly fees for Pia's trial preparation, from $130 an hour to

$100 an hour, and trial time, from $200 an hour to $150 an hour. Because the record indicates that the trial court considered and weighed the reasonableness of plaintiff's requested expert witness fees, we cannot conclude that its ultimate, reduced award of $4,196 for trial preparation and testimony constituted an abuse of discretion. *Fireman's Fund American Ins Cos v General Electric Co*, 74 Mich App 318, 329; 253 NW2d 748 (1977); *Haynes v Monroe Plumbing & Heating Co*, 48 Mich App 707, 721; 211 NW2d 88 (1973).

V

Lastly, defendant argues that the trial court incorrectly awarded plaintiff interest on the jury's award of future damages for loss of society and companionship. Subsection 6013(1) of the Revised Judicature Act, MCL 600.6013(1), provides that "for complaints filed on or after October 1, 1986, interest shall not be allowed on future damages from the date of filing the complaint to the date of entry of judgment." The act defines "future damages" as follows:

> (a) "Future damages" means damages arising from personal injury which the trier of fact finds will accrue after the damage findings are made and includes damages for medical treatment, care and custody, loss of earnings, loss of earning capacity, loss of bodily function, and pain and suffering.
> (b) "Personal injury" means bodily harm, sickness, disease, death, or emotional harm resulting from bodily harm. [MCL 600.6301.]

See *Paulitch v Detroit Edison Co*, 208 Mich App 656, 662-663; 528 NW2d 200 (1995) ("We find there can be

no interpretation of this plain language other than that a plaintiff is entitled to prejudgment interest when the suit does not result from a personal bodily injury.").

In this case, the special verdict form expressly indicates that the jury awarded $310,000 for damages that the decedent's heirs "will sustain . . . in the future for the loss of [his] society and companionship." In awarding plaintiff interest regarding the entire jury verdict, the trial court determined that "the plain meaning of the statutes [sic] which defines future damages . . . does not include *loss of consortium or society.* . . . [H]ad the legislature intended to include loss of consortium and society as future damages not subject to statutory interest, it could have specifically listed it within the definition statute." (Emphasis in original.)

We review de novo the trial court's statutory interpretation, which constitutes a question of law. *Saginaw Co v John Sexton Corp of Michigan,* 232 Mich App 202, 214; 591 NW2d 52 (1998). While the trial court properly attempted to ascertain the plain meaning of the statutory definition of future damages,[10] we disagree with the court's interpretation. We find that

---

[10] We note the following, well-established principles governing statutory interpretation:

> The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. This task begins by examining the language of the statute itself. The words of a statute provide "the most reliable evidence of its intent . . . ." If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. [*Sun Valley Foods Co v Ward,* 460 Mich 230, 236; 596 NW2d 119 (1999) (citations omitted).]

subsection 6301(a) plainly and unambiguously defines "future damages" as damages "arising from personal injury . . . [that] will accrue after the damage findings are made," and that "personal injury" clearly encompasses "bodily harm, sickness, disease, *death*, or emotional harm resulting from bodily harm." Subsection 6301(b) (emphasis added). Thus, reading subsections 6301(a) and (b) together, "future damages" plainly include damages arising from death that the jury finds will accrue after entry of the verdict. Damages for loss of society and companionship qualify as damages arising from death. Therefore, the instant damages for loss of society and companionship that the jury awarded for the period of the anticipated posttrial life of the decedent constituted future damages under § 6301, on which "interest shall not be allowed." Subsection 6013(1).

In response to plaintiff's suggestion that loss of society and companionship cannot be future damages under subsection 6301(a) because the list of specific damages within this subsection does not include loss of companionship or society, we note that "[w]hen used in the text of a statute, the word 'includes' can be used as a term of enlargement or of limitation, and the word in and of itself is not determinative of how it is intended to be used." *Frame v Nehls*, 452 Mich 171, 178-179; 550 NW2d 739 (1996). Because a plain reading of subsections 6301(a) and (b) indicates that the Legislature did not intend that the specific items listed after "includes" within subsection 6301(a) comprise a limited, exclusive category of "future damages," we reject plaintiff's proposed interpretation.

Accordingly, we conclude that the trial court erred in granting plaintiff interest on the jury's award of

$310,000 in future damages for loss of society and companionship.

We affirm the jury's verdict, reverse the trial court's awards of (1) $1,819.83 in costs for the seven depositions not filed with the trial court clerk and (2) interest on the jury's $310,000 award of future damages for loss of society and companionship, and remand for entry of an order incorporating an appropriate calculation of interest pursuant to MCL 600.6013. We do not retain jurisdiction.