*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JULIE BROOKS, Personal Representative of the
ESTATE OF HELEN G. FOWLER,

       Plaintiff-Appellee,

v

SHELLIE SPACIL, Personal Representative of the
ESTATE OF JENNIFER L. FOWLER,

       Defendant-Appellant.

UNPUBLISHED
January 25, 2024

No. 361353
St. Clair Circuit Court
LC No. 19-001327-NO

Before: GADOLA, C.J., and MURRAY and YATES, JJ.

PER CURIAM.

       In 2018, Jennifer Fowler assumed the role of patient advocate for her 79-year-old mother, Helen Fowler, who had been diagnosed with dementia and resided at an assisted living facility. On November 10, 2018, Jennifer took Helen from the facility to Jennifer's home, where Jennifer fatally shot both Helen and herself. Another daughter, Julie Brooks, as personal representative of Helen's estate ("plaintiff"), brought this wrongful-death action against Jennifer's estate ("defendant"). A jury awarded plaintiff damages of $557,105 for loss of society and companionship. The trial court entered a final judgment for plaintiff of $623,606.24, which included costs, interest, and case evaluation sanctions. Defendant appeals as of right. We affirm.

       Helen and her late husband had four children: Julie Brooks, Thomas Fowler, Jane Korth, and Jennifer Fowler. After Helen's husband passed away in 2009, Helen's mental condition began to decline. The children agreed that sometime before 2018, Helen was no longer able to handle her financial and medical affairs. Julie was previously designated as Helen's attorney-in-fact and patient advocate. In 2018, it became apparent that Helen could no longer live on her own and she was moved to Mercy Village, an assisted living facility. Later in 2018, Mercy Village advised Julie that Helen needed to be moved to another facility where she could receive more appropriate assistance. Helen was diagnosed with dementia and there were negative changes in her behavior. In mid-2018, Julie was no longer able to serve as her mother's patient advocate because of other family commitments. Jennifer assumed that role. In September 2018, Helen was hospitalized for a urinary tract infection and the medical staff adjusted her medications to better control her moods

-1-

and behavior. In September, Helen was released from the hospital and moved to a new facility, Lakeshore Woods.

On November 10, 2018, Jennifer picked up Helen from Lakeshore Woods and took her to Jennifer's home. In a telephone call with Jane's boyfriend, Douglas Dalton, Jennifer stated that she was going to take control of matters and could not see her mother continue on "like this anymore." Dalton tried to assure Jennifer that everything would be fine, but contacted the police and went over to Jennifer's house. After Dalton and the police arrived, they discovered Helen and Jennifer in a bed with fatal gunshot wounds.

Before trial, Jane withdrew any claim she has in the wrongful death count and the trial court ruled that plaintiff could not recover damages for mental anguish or conscious pain and suffering. At trial, the trial court directed a verdict for plaintiff on defendant's liability for Helen's death. The jury was asked to only determine damages. As relevant to this appeal, the jury awarded plaintiff $450,000 for Julie's and Thomas's loss of society and companionship from November 10, 2018, to the date of the verdict, and $105,000 for their loss of society and companionship from 2021 to 2027. The trial court denied defendant's motion for a new trial or remittitur.

## I. SUFFICIENCY OF THE EVIDENCE OF DAMAGES

Defendant first argues that the evidence was insufficient to support an award of damages for loss of society and companionship, as Helen's dementia, which led to behavioral problems, made her no longer able to provide society and companionship to her own children.

Preliminarily, defendant did not properly preserve this issue by raising it in an appropriate motion for a directed verdict at trial or a postjudgment motion for judgment notwithstanding the verdict. Therefore, the issue is waived "[a]bsent compelling circumstances requiring action to avoid a miscarriage of justice." *Napier v Jacobs*, 429 Mich 222, 235; 414 NW2d 862 (1987) (quotation marks and citation omitted). Defendant does not explain why review of this issue is necessary to avoid a miscarriage of justice. Although defendant argues that allowing the jury to consider damages for loss of society and companionship resulted in an unfavorable verdict, "the loss of a favorable jury verdict," by itself, is not a miscarriage of justice. *Id*. at 233-234. However, because defendant moved for a new trial under MCR 2.611(A)(1)(d) on the ground that the evidence did not support the jury's award of damages, we will review this issue in that context. A trial court's ruling on a motion for a new trial is reviewed for an abuse of discretion. *Carlsen v Southwestern Mich Emergency Servs, PC*, 338 Mich App 678, 693; 980 NW2d 785 (2021); *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 87; 910 NW2d 691 (2017).

The wrongful-death act permits a jury to award damages for "the loss of the society and companionship of the deceased." MCL 600.2922(6); *May v Grosse Pointe Park*, 122 Mich App 295, 298; 332 NW2d 411 (1982). As explained in *McTaggart v Lindsey*, 202 Mich App 612, 616; 509 NW2d 881 (1993):

> A claim for loss of society and companionship under the wrongful death act addresses compensation for the destruction of family relationships that results when one family member dies. *Crystal v Hubbard*, 414 Mich 297, 326; 324 NW2d 869

(1982). The only reasonable means of measuring the actual destruction caused is to assess the type of relationship the decedent had with the claimant in terms of objective behavior as indicated by the time and activity shared and the overall characteristics of the relationship. [*In re*] *Carr*, [189 Mich App 234, 239; 471 NW2d 637 (1991)].

"Just as no marketplace formula exists to mathematically calculate pain and suffering, no precise formula exists for the loss of society and companionship." *May*, 122 Mich App at 298. "Those determinations are for the jury, and a reviewing court will not arbitrarily substitute its judgment for that of the fact finder." *Id*. "[P]lacing a monetary value on a human life is at best a nebulous decision-making process which does not lend itself to an exacting type of review." *Id*.

As noted, defendant argues that the evidence did not support the verdict, largely because Helen's dementia meant that she could no longer provide society and companionship to her children.

We disagree with the premise of defendant's argument that there can be no loss of society and companionship if the plaintiff's decedent is suffering from a mental illness or other significant health concern. Although Helen's illness and resulting behavioral issues may have impacted her contact with her children, she still could engage with them. Furthermore, she was receiving medical care that offered hope that her condition could improve and be controlled by adjusting her medications. Her past behavioral issues did not eliminate the possibility of maintaining a relationship with her children, both presently and in the future.

Furthermore, there was conflicting testimony regarding the nature and scope of Julie's and Thomas's relationship with Helen at the time of her death. It is apparent that defendant disagrees with the accuracy of Thomas's and Julie's testimony about their relationship with Helen in the months before her death. Although Julie and Thomas had more limited contact with Helen before her death, Julie attributed the limited contact to her own family commitments and Thomas to restrictions on visitation imposed by Lakeshore Woods, the facility where Helen was living at the time of her death. Julie and Thomas both explained how they were impacted by Helen's death, explaining that they could continue to communicate with Helen and spend time with her, and both described missing seeing and being with her, despite her challenges. The weight and credibility given their testimony regarding the reasons for their more limited contact with Helen before her death and how they were impacted by her death, were for the jury to decide.

Defendant argues that Julie's and Thomas's testimony actually described their mental anguish over Helen's death, rather than a loss of society and companionship. Defendant relies on the changes that Helen experienced, which resulted in her no longer being the same person her children knew years before. Julie's and Thomas's testimony addressed their relationship with Helen, not her death. In particular, they described activities that they continued to participate in with Helen, such as reminiscing and watching television together, which represented the time and activities they shared, but could no longer experience. Their testimony went beyond describing no longer being able to touch and see their mother. Their testimony properly addressed their loss of society and companionship. The trial court did not abuse its discretion by denying defendant's motion for a new trial on this ground.

## II. INCONSISTENT VERDICT

Defendant also argues that it is entitled to a new trial on the ground that the jury's damage awards are inconsistent.[1]

As noted earlier, the jury awarded plaintiff $450,000 in damages for loss of society and companionship from November 10, 2018 (the date of Helen's death) to the date of the verdict (September 30, 2021), $5,000 a year for each year from 2021 to 2026, and $75,000 for 2027, the last year of Helen's expected life. Defendant now argues that it was inconsistent for the jury to award $450,000 for the first three years after Helen's death, but then award only $5,000 a year for the next six years, and then award $75,000 for the last year of Helen's life expectancy.

As defendant observes, "the general rule is that where a verdict in a civil case is inconsistent and contradictory, it will be set aside and a new trial granted." *Harrington v Velat*, 395 Mich 359, 360; 235 NW2d 357 (1975). A court is required to make every effort to reconcile a seemingly inconsistent verdict, which "requires a careful look, beyond the legal principles underlying the plaintiff's causes of action, at how those principles were argued and applied in the context of this specific case." *Bean v Directions Unlimited, Inc*, 462 Mich 24, 31-32; 609 NW2d 567 (2000) (quotation marks and citation omitted). The jury's verdict is to be upheld, even if it is arguably inconsistent, if there is any interpretation of the evidence that provides a logical explanation for the jury's findings. *Id*. at 31.

The jury's awards of a greater amount for the three years after Helen's death and lesser amounts for the next six years can be reconciled with the evidence of the progression of Helen's dementia, which the jury could have found would have impacted the quality and amount of time Julie and Thomas could spend with Helen during her later years. Furthermore, it was not inherently inconsistent for the jury to award plaintiff a greater amount of damages for 2027, the last year of Helen's life expectancy, given that her wrongful death deprived Julie and Thomas of the opportunity to spend time with her at the end of her life. Julie described how the family had that opportunity when her father died, and how much that meant to the family. Therefore, it was not inconsistent for the jury to place a greater value on that lost opportunity at the end of Helen's life expectancy. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for a new trial on this ground.

## III. MORTALITY TABLES AND JURY INSTRUCTIONS

Defendant argues that it is entitled to a new trial because the trial court erred by taking judicial notice of mortality tables to determine Helen's life expectancy and by instructing the jury on the use of this evidence.

Although defendant objected to, and therefore preserved its argument regarding, the applicability of the mortality tables, it did not object to the trial court's instructions concerning the

---

[1] Defendant did not challenge plaintiff's request for $2,105 in damages for funeral and burial expenses.

use of this evidence. Therefore, its argument regarding instructional error is waived. *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 545; 854 NW2d 152 (2014); see also *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 2-5. We review the trial court's decision to take judicial notice of the mortality tables and admit them into evidence for an abuse of discretion. *Freed v Salas*, 286 Mich App 300, 341; 780 NW2d 844 (2009).

At the close of plaintiff's proofs, plaintiff asked the trial court to take judicial notice of the Centers for Disease Control's life expectancy tables and admit the tables as an exhibit. Defendant objected, arguing that the tables are not admissible in a wrongful-death case unless there is a stipulation or there is evidence offered on mortality. Defendant did not challenge the authenticity of the evidence, but argued that, "in this case we have medical records that show this is not a normal health situation and, therefore, I believe Case Law [sic] is clear that they are not admissible." The trial court admitted the mortality tables into evidence, explaining:

> Well, I think what I heard was there needs to be some expert testimony to that effect and simply because there are some records that are present that might raise that question there has been no expert testimony regarding the subject of life expectancy whether that is normal or shortened because of the condition that we have heard about. So, so to the extent that that is required we don't have that on this record.
>
> The fact that the jury instruction on statutory mortality tables has been deleted I don't think that that means they can't be considered it just means that we don't have that instruction anymore. Instructions come and go all the time for a variety of reasons and the committee on jury instructions is constantly revising those and tweaking them for whatever reason.
>
> It would seem to me that the evidence should be allowed. It is something that goes more to weight than admissibility. To the extent that they are what they are purported to be it will be admitted. The Court will take judicial notice of them.

The court explained to the jury that it took judicial notice of the mortality tables and admitted them as evidence, that the accuracy of the tables was not in question, but that they were "still something that you consider based upon whatever weight you feel that it deserves, as all evidence is in the case."

When discussing the final instructions with the attorneys, defense counsel expressed that he had "no issues with the instructions as set forth," but again objected to the court's decision to allow the use of the mortality tables, arguing that they were "not admissible for a Plaintiff who is not in an average normal or healthy condition," citing *Carbonnell v Bluhm*, 114 Mich App 216, 225; 318 NW2d 659 (1982). Plaintiff pointed out that defendant had not offered any evidence that any of Helen's conditions reduced her life expectancy as indicated by the mortality tables. The trial court instructed the jury as follows with regard to the mortality tables:

In this case, you must accept as a fact that the Life Expectancy Tables provide the average life expectancy for someone of the same age as Helen Fowler. You will recall that I took judicial notice of that because it is an easily established fact.

Initially, the trial court did not abuse its discretion by admitting the mortality tables as evidence of Helen's life expectancy. In *Little v Bousfield & Co*, 165 Mich 654, 656; 131 NW 63 (1911), our Supreme Court stated:

[T]ables showing the expectancy of life according to experience . . . are admissible in evidence whenever the expectancy of life properly comes in controversy. They are controlling, when admitted, in the absence of evidence tending to show that the deceased had a probability of life greater or less than is shown by the tables. [Citations omitted.]

In *Carbonnell*, 114 Mich App at 225, this Court upheld the trial court's refusal to give the standard jury instruction on a statutory mortality table, SJI 34.01,[2] because that table applied to ordinarily healthy persons and the evidence in that case showed that the plaintiff had undergone heart surgery, had recurring heart problems, and suffered a stroke and seizures. This Court agreed that SJI 34.01 was not applicable to a person who was not in an average, normal, healthy condition. *Id.*, citing *Fortner v Koch*, 272 Mich 273, 279; 261 NW 762 (1935).

By contrast, in *Rickwalt v Richfield Lakes Corp*, 246 Mich App 450, 462-463; 633 NW2d 418 (2001), this Court held that the trial court did not err by allowing the jury to consider the mortality tables, which reflected the average life spans of generally healthy individuals, despite evidence that the plaintiff's decedent had some medical conditions that tended to shorten his life expectancy. The defense's cardiology expert explained that the decedent's life expectancy was limited due to heart disease, but the expert could not specify to what extent it was limited. *Id.* at 463 n 7. In upholding the trial court's decision to allow the jury to consider the mortality tables, this Court explained:

The trial court did not instruct the jury that it must adhere to the mortality table, however, but advised the jury that "this mortality table may be considered with all the other evidence in determining life expectancy." We detect no error in this instruction. Moreover, in light of the jury's award of future damages for only seven years, instead of the approximately twelve years of life that the mortality table anticipated for an individual nearly sixty-seven years of age, we conclude that even if the jury's consideration of the mortality table was inappropriate, our affirmance of the award would be consistent with substantial justice. *Winiemko v Valenti*, 203 Mich App 411, 418; 513 NW2d 181 (1994). [*Rickwalt*, 246 Mich App at 463.]

---

[2] The standard jury instructions regarding mortality tables, M Civ JI 53.01 and 53.02, were deleted after the Legislature removed the mortality tables addressed in those instructions from MCL 500.834.

In *Reardon v Buck*, 335 Mich 318, 324; 55 NW2d 847 (1952), the Court upheld the admission of mortality tables where the plaintiff "was a reasonably healthy man for his age, and that men of his age are presumed to be somewhat arthritic." In *Denman v Johnston*, 85 Mich 387, 398-399; 48 NW 565 (1891), the Court explained the limited purpose of such evidence:

> We have held that the mortuary tables of the expectancy of life based upon the American experience are competent to be considered by a jury in a proper case in considering the expectancy of life. These are embodied in our statutes, and the court can take judicial notice of their contents. But their use in trials for negligent injuries not causing death requires great caution on the part of the trial court. The expectancy of life in those tables is based upon the lives of healthy persons who are of the ages indicated; and it cannot be said, as was said by the trial judge in this case, that a party who, prior to the injury complained of, was afflicted with hernia, which had been aggravated by such injury, and who was also suffering from internal injuries, as claimed, had an expectancy of life at the age of 52 of 17 years, or any other number of years. The tables furnish no basis of expectancy of such a life. They do form a basis of the expectancy of life of a healthy person of the age of 52, and such expectancy is stated in the tables to be 19.49 years; but other testimony of experts would be required to show what the plaintiff's expectancy of life would be, taking into consideration his ailments, and the effect they would probably have to shorten his expectancy. Such testimony must necessarily be problematical, but perhaps it is the best that is attainable to establish the probability.

See also *In re Estate of Eggleston*, 266 Mich App 105, 112; 698 NW2d 892 (2005).

We disagree with defendant's suggestion that the life expectancy tables should not have been admitted because Helen was not a healthy individual who was expected to live a normal life expectancy. Although the evidence showed that Helen suffered from acute dementia that affected her behavior and her relationship with her children, and defendant asserts that she had other health problems, defendant did not produce any evidence that Helen's mental deficits affected her life expectancy or that Helen had a physical condition that reduced her life expectancy. Indeed, the mortality tables were the only evidence produced *by either party* with regard to Helen's life expectancy. Further, because defendant did not produce any evidence that Helen was not expected to live as long as an average healthy woman of her age, the trial court did not err by instructing the jury to consider the mortality tables. In addition, because defendant failed to object to the court's instructions regarding the use of the mortality tables, it waived any error with those instructions. *Landin*, 305 Mich App at 545.

## IV. PHOTOGRAPHIC EVIDENCE

At trial, the jury was allowed to view three photographs of the bodies of Jennifer and Helen as they were discovered after their deaths. Defendant argues that the trial court erred by refusing to exclude these photographs under MRE 403 on the ground that any probative value was

substantially outweighed by their prejudicial effect.[3]  We hold that defendant waived this issue by agreeing to the admission of the photographs at trial.

Defendant initially raised this issue in a pretrial motion in limine to exclude any photographic or video evidence depicting the scene of Helen's and Jennifer's deaths, arguing that the evidence should be excluded under MRE 403 because any probative value was substantially outweighed by the danger of unfair prejudice.  At that time, defendant did not identify or produce any specific photos that it was challenging.  The trial court denied defendant's motion without prejudice, particularly because defendant had not identified any specific photographs that it was contesting, thereby precluding the court from properly evaluating whether any photo was unduly prejudicial or considering the purpose for which the evidence was offered.  The trial court explained that defendant could renew any objection to the admissibility of any photographs at trial, and defense counsel indicated that he understood.

At the beginning of trial, plaintiff's counsel stated on the record that both sides had reviewed the exhibits before trial and came to an agreement on which ones to admit.  According to the transcript, plaintiff's Exhibits 11 and 12 were included in the group of exhibits marked.

During trial, when the first photograph was admitted, which showed the revolver in Jennifer's hand, there was some discussion on the record.  Defense counsel did not know if that photograph had been admitted and plaintiff's counsel stated that it was admitted earlier.  Defendant did not otherwise object to the admission of any photos.  The court explained to the jury that there was an agreement reached over the admission of certain exhibits during a break in the proceedings.

From the comments on the record, it is apparent that the parties reviewed the photographs before trial and agreed on which ones to admit.  Defendant never objected to the admission of any photographs at trial on the ground that they were unfairly prejudicial.  Because the record indicates that defendant agreed on the photographs that were admitted, it waived any argument that the photos should have been excluded because they were unduly prejudicial.  *ARM v KJL*, 342 Mich App 283, 294; 995 NW2d 361 (2022); *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014).

V.  MOTIONS FOR REMITTITUR AND A NEW TRIAL

Defendant also argues that the trial court erred by denying its motion for a new trial or remittitur on the ground that the jury's verdict was excessive.

A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion. *Andreson*, 322 Mich App at 87; *Carlsen*, 338 Mich App at 693.  This Court also reviews a trial court's decision regarding remittitur for an abuse of discretion.  *Pugno v Blue Harvest Farms, LLC*, 326 Mich App 1, 30; 930 NW2d 393 (2018).  A court abuses its discretion when it chooses

---

[3] On appeal, defendant does not challenge the admission of video evidence of the death scene.

an outcome outside the range of reasonable and principled outcomes. *Andreson*, 322 Mich App at 83-84.

In its motion for a new trial or remittitur, defendant argued that the jury's total award of $550,000 for Julie's and Thomas's loss of society and companionship was excessive considering (1) the definition of society and companionship, (2) other cases involving the loss of older parents, and (3) the impact of Helen's dementia on her relationships with Julie and Thomas. Although defendant referred to other verdicts, it did not cite any other cases to show that the jury's verdict was excessive. Instead, defendant primarily argued that the breakdown of damages was not supported by the evidence because there was no evidence that any loss of society and companionship would vary between 2019 to 2027. Defendant proposed reducing the jury verdict to $115,000, which was based on its claim that the jury's award for 2018-2020 should be reduced from $450,000 to $10,000, while allowing the awards of future damages to remain intact. The trial court denied defendant's motion, stating:

> When juries render an award, I guess especially in a case like this where future damages are at play, I'm not sure that it's appropriate for the Court to go back and nitpick and try to reconcile in an extremely precise way exactly what the jury may or may not have been thinking about in terms of their award of damages. I tend to look at things in terms of the totality of the circumstances and the totality of the award and when that is done this award is clearly not excessive.

> The $450,000 base award through the time of trial is totally consistent with what was being discussed at the case evaluation level and with the Facilitator. I have to assume that Mr. Keyes [defense counsel] at that time on behalf of his client was making the appropriate arguments regarding only certain damages being available. I have to assume that good Case Evaluators and good Facilitators are going to understand the law and apply it the way that it is intended to be applied.

In determining whether remittitur is appropriate, a trial court must view the evidence in the light most favorable to the nonmoving party, *Pugno*, 326 Mich App at 30, and decide whether the jury's award is supported by the evidence, *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 462; 750 NW2d 615 (2008). "This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented." *Id*. The power of remittitur should be exercised with restraint and if the jury's award falls reasonably within the range of the evidence and what reasonable minds would deem just compensation, it should not be disturbed. *Id*.

Initially, defendant has not cited any authority for the proposition that it was improper for the trial court to reference the case evaluation award in determining whether the jury's verdict was in line with the evidence. With regard to the court rules on mediation, courts have explained that they should not be used to review a jury verdict because that frustrates the public policy of attempting to encourage settlements and mediation awards often are merely a figure arrived at to facilitate settlement rather than accurately assess damages. *Precopio v Detroit*, 415 Mich 457, 473-474; 330 NW2d 802 (1982); *Guider v Smith*, 157 Mich App 92, 108-109; 403 NW2d 505 (1987), aff'd 431 Mich 559 (1988). Further, to the extent that the mediation award was confidential, defendant did not object when the trial court referenced the mediator's decision, and

the trial court's ruling did not involve any disclosure of confidential information. Moreover, as the trial court noted, there is no reason to believe that the case evaluators' or mediator's awards were based on awards for conscious pain and suffering by Helen considering that the evidence showed that she died quickly, or for mental anguish for her heirs who did not witness her death.

Although it seems extraordinary that the jury, the case evaluation panel, and the mediator all arrived at very similar awards, defendant did not offer any factual support for its position that the jury's award was out of line with awards in similar cases. Moreover, the jury awarded significantly less than that requested by plaintiff's counsel, who asked the jury to award $450,000 each for Julie's and Thomas's loss of society and companionship between the date of Helen's death and the time of trial. Although defendant requested that the jury's award of $450,000 for loss of society and companionship through the date of trial be reduced to $10,000, it did not offer any explanation grounded in the evidence for this reduced award, and more significantly, it did not persuasively establish that the evidence did not support the jury's award. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for remittitur or a new trial on the ground that the jury's verdict was excessive.

Affirmed. Plaintiff may tax costs, having prevailed in full. MCR 7.219(A).


/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Christopher P. Yates

-10-