DAWE v DR REUVAN BAR-LEVAV & ASSOCIATES, PC

Docket No. 269147. Submitted September 11, 2007, at Detroit. Decided July 10, 2008, at 9:05 a.m. Leave to appeal sought.

Elizabeth Dawe brought a medical-malpractice action in the Oakland Circuit Court against Dr. Reuvan Bar-Levav & Associates, P.C., Dr. Reuvan Bar-Levav's estate, and Dr. Leora Bar-Levav, after she was shot by a psychiatric patient during a group-therapy session. Dawe also alleged a claim of statutory failure to warn under MCL 330.1946 on the ground that the defendants knew or had reason to know that the shooter, Joseph Brooks, who had made threatening statements to the defendants, presented a danger to the other members of the group. The defendants moved for summary disposition, arguing that Dawe had failed to establish that Brooks had communicated a threat of violence against Dawe specifically. The court, Charles W. Simon, Jr., denied this motion, as well as defendants' later motion for a partial directed verdict, and a jury returned a verdict in Dawe's favor. The court denied the defendants' motion for judgment notwithstanding the verdict. The defendants appealed.

The Court of Appeals *held*:

1. MCL 330.1946, which sets forth the duties of mental-health professionals to warn third persons of danger from their patients, abrogated all common-law duties to warn or protect third persons from dangerous patients. A plain reading of the statute indicates that the statute was intended to modify and preempt the common-law duty to warn or protect that arises out of the special relationship between mental-health professionals and their patients. The statute also abrogates the common-law duty to treat other patients within the applicable professional standard of care to the extent that it includes the duty to provide a safe clinical environment for patients. The repeated use of the word "section" in subsection 5 of MCL 330.1946, which specifies that MCL 330.1946 does not affect duties that mental-health professionals may have under other sections of law, indicates that the Legislature intended to preserve statutory duties, not common-law duties.

2. The phrase "third person," as used in MCL 330.1946, refers to all other persons who are neither the dangerous patient nor the mental-health professional, including the professional's other patients.

3. Because Dawe failed to present evidence from which a reasonable jury could conclude that Brooks communicated a threat of physical violence specifically against her to the defendants, she failed to establish a claim as a matter of law, and the trial court erred by failing to grant the defendants a directed verdict.

Reversed, judgment vacated, and case remanded for further proceedings.

SMOLENSKI, P.J., dissenting, would hold that MCL 330.1946(1) applies only to patients who are "recipients" as defined by MCL 330.1100c(12), and, therefore, modified common-law duties only with respect to mental-health professionals who are treating recipients. Accordingly, because Brooks was not a recipient, the defendants had no statutory duty to warn or protect the plaintiff, and the trial court should have granted the defendant's motion for a directed verdict on that theory of liability. However, this error was harmless because the plaintiff's claim that the defendants breached their common-law duty to provide a safe clinical environment remained viable.

1. MENTAL HEALTH — PRACTITIONERS — THREATS BY PATIENTS — DUTY TO WARN THIRD PARTIES.

The statutory provision that sets forth the duties of mental-health professionals to warn third persons of danger from their patients abrogated all common-law duties to warn or protect third persons, including the duty to provide other patients with a safe clinical environment (MCL 330.1946).

2. STATUTES — WORDS AND PHRASES — MENTAL HEALTH — PRACTITIONERS — DUTY TO WARN THIRD PARTIES.

The phrase "third person," in the statutory provision that sets forth the duties of mental-health professionals to warn of or protect third persons from danger from their patients, refers to all other persons who are neither the dangerous patient nor the mental-health professional, including the professional's other patients (MCL 330.1946).

*Mark Granzotto, P.C.* (by *Mark Granzotto*), and *Haas & Goldstein, P.C.* (by *Justin Haas*), for the plaintiff.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Noreen L. Slank* and *Regina T. Delmastro*), for the defendants.

Before: SMOLENSKI, P.J., WHITBECK, C.J., and KELLY, J.

WHITBECK, C.J. In this medical malpractice action, defendants Dr. Reuvan Bar-Levav & Associates, the estate of Dr. Reuvan Bar-Levav (Dr. Bar-Levav), and Dr. Leora Bar-Levav appeal as of right the jury verdict in favor of Elizabeth Dawe on various grounds. On cross-appeal, Dawe appeals the trial court's calculation of prejudgment interest on the jury's award. We reverse, vacate the judgment, and remand.

### I. BASIC FACTS

This medical malpractice action arises out of a shooting incident at defendants' psychiatric office where Dawe received treatment. On June 11, 1999, Joseph Brooks, who was a former patient of Dr. Bar-Levav,[1] came to the office, drew a handgun, and shot and killed Dr. Bar-Levav. Brooks then proceeded to the back of the office and fired into Dawe's group therapy room. Brooks killed one patient and wounded others, including Dawe. After firing dozens of rounds into the room, Brooks committed suicide.

Dawe sued defendants, alleging that Brooks made threatening statements to defendants in which he indicated that he "fantasized about murdering" and that he demonstrated his ability to carry out threats by coming to defendants' office with a handgun. Dawe further alleged that a "manuscript" that Brooks delivered to defendants in June 1999 "could be reasonably construed as a threat of violence against other members who participated in his group therapy sessions, including [Dawe]." Accordingly, Dawe alleged that defendants were liable under two theories: statutory liability for failure to warn under MCL 330.1946, and common-law medical malpractice. With respect to her common-law

---

[1] Defendants discharged Brooks from their care on March 19, 1999.

medical malpractice claim, Dawe alleged that defendants breached their applicable standard of care, which included "informing the police, warning patients or others, and taking reasonable precautions for the protection of patients when a doctor or health care provider has information which could reasonably be construed as a threat of violence against a patient or others," when defendants failed to warn Dawe and the police of Brooks's "threats" or take reasonable steps to protect Dawe. Dawe also filed an affidavit of Meritorious Claim in support of her complaint.[2]

Defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10), arguing that there was no evidence that Brooks expressed a threat to defendants about Dawe specifically and, therefore, defendants owed no duty to warn or protect Dawe under MCL 330.1946. Defendants also noted that Dawe was not alleging malpractice with regard to her individual care; rather, her only allegation was a failure to fulfill the duty to warn, which was derived solely from the statute.

In response, Dawe argued that it was significant that she was defendants' patient rather than merely a "third person" to whom the statute applied. Dawe argued that her special physician-patient relationship with defendants also required them to treat her within the applicable standard of care stated in her complaint. In other words, Dawe argued that defendants owed both statutory and common-law duties. Dawe further argued that she had presented a genuine issue of material fact that defendants violated that standard of care. In support of her motion, Dawe submitted the affidavit of Dr. Mark Fettman, Dawe's psychiatric expert, who attested that a psychiatrist has a duty to take reasonable precautions for the protection of patients. According to Dr. Fettman,

---

[2] See MCL 600.2912d.

included within this duty is the requirement that the psychiatrist assess a patient to determine if the patient is a suitable candidate for group therapy before placing the patient in a group. Dr. Fettman averred that once a patient has been placed in group therapy, the psychiatrist has a further duty to continually assess the patient to ensure that the patient remains suitable for group therapy. Dr. Fettman attested that defendants violated the applicable standard of care by placing Brooks in a group session with Dawe and other patients.

The trial court ruled that summary disposition was not appropriate because Dawe had stated a prima facie case and there were genuine issues of material fact regarding whether defendants violated MCL 330.1946 or the applicable standard of care. Accordingly, the trial court denied defendants' motion.

At trial, Dawe argued that defendants breached their duty to warn and that defendants breached their duty to provide Dawe with a safe clinical environment for her treatment. Specifically, Dawe contended that defendants breached the standard of care by placing Brooks in Dawe's group therapy sessions when they knew or should have known that Brooks was a danger to the other group members.

After the close of Dawe's proofs, defendants moved for a partial directed verdict on Dawe's claim of failure to warn under MCL 330.1946, arguing that Dawe failed to establish that Brooks communicated to defendants a threat of violence specifically against Dawe. Defendants also argued that Dawe failed to present expert testimony concerning the standard of care applicable under the statute; that is, defendants noted that Dr. Fettman's testimony applied solely to defendants' alleged duties when placing Dawe in group therapy, not to defendants' duty to warn. In response, Dawe again argued that it

was significant that she was defendants' patient, apparently on the basis that MCL 330.1946 did not even apply in cases where the victim was a patient.[3] Nevertheless, the trial court denied the motion on the ground that Dawe had stated a prima facie case sufficient to survive a directed verdict.

After the six-day trial in September 2005, the jury returned a verdict in favor of Dawe. Defendants moved for a judgment notwithstanding the verdict (JNOV) and for a new trial, raising several of the same issues now raised on appeal; however, the trial court denied the motions. Defendants now appeal.

## II. PREEMPTION OF A PSYCHIATRIST'S COMMON-LAW DUTY TO PROTECT

Defendants argue that the only duty that a psychiatrist has to protect others from a patient is the duty imposed by MCL 330.1946, and that the Legislature abrogated all other common-law duties to protect third persons when it enacted MCL 330.1946. We agree.

### A. THE STATUTE

MCL 330.1946(1) provides:

> If a patient communicates to a mental health professional who is treating the patient a threat of physical violence against a reasonably identifiable third person and the recipient[4] has the apparent intent and ability to carry

---

[3] Dawe's counsel specifically stated: "[T]his statute that [defendants are] referring to is talking—it's in establishing a duty by someone that isn't normally a patient. That doesn't exist here because Elizabeth Dawe was [a patient]. . . . This other statute is talking about if Elizabeth Dawe wasn't a patient[.]"

[4] 1995 PA 290 amended MCL 330.1946 to change the third use of the word "patient" in subsection 1 to "recipient." All other references to "patient" in the statute were left unaltered. The term "recipient" is defined to mean

out that threat in the foreseeable future, the mental health professional has a duty to take action as prescribed in [MCL 330.1946(2)]. Except as provided in this section, a mental health professional does not have a duty to warn a third person of a threat as described in this subsection or to protect the third person.

MCL 330.1946(2) provides:

A mental health professional has discharged the duty created under subsection (1) if the mental health professional, subsequent to the threat, does 1 or more of the following in a timely manner:

(a) Hospitalizes the patient or initiates proceedings to hospitalize the patient under [MCL 330.1400 *et seq.*] or [MCL 330.1498a *et seq.*].

(b) Makes a reasonable attempt to communicate the threat to the third person and communicates the threat to the local police department or county sheriff for the area where the third person resides or for the area where the patient resides, or to the state police.

(c) If the mental health professional has reason to believe that the third person who is threatened is a minor or is incompetent by other than age, takes the steps set forth in subdivision (b) and communicates the threat to the department of social services in the county where the minor resides and to the third person's custodial parent, noncustodial parent, or legal guardian, whoever is appropriate in the best interests of the third person.

In other words, a mental-health professional does not have a duty to take the actions described under MCL

"an individual who receives mental health services from the department, a community mental health services program, or a facility or from a provider that is under contract with the department or a community mental health services program." MCL 330.1100c(12). Although not all patients of mental-health professionals will qualify as recipients, see *Saur v Probes*, 190 Mich App 636, 641; 476 NW2d 496 (1991) (construing former MCL 330.1700, which defined "recipient" in a substantially similar way to present MCL 330.1100c[12]), for this issue, it is not necessary to examine how the use of the term "recipient" might affect the duty imposed by this statute.

330.1946(2) unless four criteria are met: (1) a mental-health professional is presently treating a patient, (2) that patient communicates a threat of physical violence to the mental-health professional, (3) that threat of physical violence is directed against a readily identifiable third person, and (4) the patient has the apparent intent and ability to carry out the threat in the foreseeable future.

### B. PRINCIPLES OF COMMON-LAW PREEMPTION

"The common law, which has been adopted as part of our jurisprudence, remains in force until amended or repealed."[5] "Whether a statutory scheme preempts, changes, or amends the common law is a question of legislative intent."[6] But "legislative amendment of the common law is not lightly presumed."[7] When the Legislature exercises its authority to modify the common law, "it should speak in no uncertain terms."[8]

### C. PRINCIPLES OF STATUTORY INTERPRETATION

When interpreting a statute,

[t]his Court's primary task . . . is to discern and give effect to the intent of the Legislature. "The words of a statute provide 'the most reliable evidence of [the Legislature's] intent . . . .' " In discerning legislative intent, a court must "give effect to every word, phrase, and clause in a statute . . . . The Court must consider "both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.' " "The statutory lan-

---

[5] *Wold Architects & Engineers v Strat*, 474 Mich 223, 233; 713 NW2d 750 (2006), citing Const 1963, art 3, § 7.

[6] *Id.*

[7] *Id.*

[8] *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006).

guage must be read and understood in its grammatical context, unless it is clear that something different was intended." "If the language of a statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written."[9]

The Legislature is presumed to have intended the meaning it plainly expressed.[10]

### D. RELEVANT CASELAW INTERPRETING MCL 330.1946

To establish a prima facie case of negligence, the plaintiff must prove as a matter of law that the defendant owed a duty to the plaintiff to avoid negligent conduct.[11] Generally, under the common law, "there is no duty that obligates one person to aid or protect another."[12] However, under the common law, "[w]here there is a duty to protect an individual from a harm by a third person, that duty to exercise reasonable care arises from a 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury."[13]

In *Davis v Lhim*,[14] the Court adopted the reasoning of *Tarasoff v Regents of Univ of California*[15] and held that

---

[9] *Shinholster v Annapolis Hosp*, 471 Mich 540, 548-549; 685 NW2d 275 (2004) (internal citations omitted).

[10] *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219; 731 NW2d 41 (2007).

[11] *Swan v Wedgwood Christian Youth & Family Services, Inc*, 230 Mich App 190,195; 583 NW2d 719 (1998).

[12] *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988).

[13] *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997).

[14] *Davis v Lhim*, 124 Mich App 291, 301; 335 NW2d 481 (1983), rev'd on other grounds sub nom *Canon v Thumudo*, 430 Mich 326 (1988).

[15] *Tarasoff v Regents of Univ of California*, 17 Cal 3d 425; 131 Cal Rptr 14; 551 P2d 334 (1976).

the special relationship between a psychiatrist and his or her patient gives rise to "a duty of reasonable care to a person who is foreseeably endangered by [the psychiatrist's] patient." The Michigan Supreme Court later reversed *Lhim* on the ground that the psychiatrist in *Lhim* was protected by governmental immunity, and, in light of that holding, the Court found it unnecessary to address "whether a duty to warn should be imposed upon mental-health professionals to protect third persons from dangers posed by patients."[16]

Shortly thereafter, the Michigan Legislature enacted MCL 330.1946, thereby codifying the duty of mental-health professionals to warn third parties of danger from their patients.[17] As recognized by this Court, the legislative history of the statute indicates that the Legislature enacted the statute to "limit the liability of mental health practitioners."[18]

Since its enactment, only two published cases have interpreted the statute. However, the issue now before this Court—whether a common-law duty to warn or protect has survived the statute's limitation on a psychiatrist's liability to protect others—has not been resolved.

In 1996, this Court released its first opinion addressing the statute. In *Jenks v Brown*, the plaintiff's ex-wife told her psychiatrist that she intended to kidnap her, and the plaintiff's, son.[19] The plaintiff then sued the psychiatrist, alleging that he breached MCL 330.1946 by failing to warn the plaintiff of his ex-wife's threat. This Court affirmed the trial court's grant of summary

---

[16] *Canon, supra* at 355.

[17] See 1989 PA 123.

[18] *Jenks v Brown*, 219 Mich App 415, 418; 557 NW2d 114 (1996), citing House Legislative Analysis, HB 4237, July 11, 1989.

[19] *Id.* at 417.

disposition in the psychiatrist's favor, holding that the psychiatrist had no duty to the plaintiff because the threat was directed at the child, not the plaintiff. This Court explained:

> In prior years, the common-law duty to warn had been extended in some cases to unnamed third parties and even to property. In response to these developments, the duty to warn statute limited a mental health practitioner's duty to that as provided in the statute. Furthermore, in order for any duty to arise, a patient must communicate "a threat of physical violence against a reasonably identifiable third person." It is apparent from the language of the statute and its legislative history that it is intended to protect only those readily identifiable individuals against whom a threat of physical violence is made.[20]

The plaintiff also sought to amend his complaint to add a common-law theory of negligence.[21] This Court ruled any such amendment futile on the ground that there was no special relationship between the plaintiff and the psychiatrist that would give rise to a duty to protect the plaintiff.[22] In so ruling, this Court acknowledged but declined to address the issue "whether a claim brought against a mental-health practitioner under a common-law theory of failure to warn is superseded by MCL 330.1946[.]"[23]

Two years later, this Court again published an opinion interpreting the statute. In *Swan v Wedgwood Christian Youth and Family Services, Inc*, a teenage boy (LaPalm) killed his mother's boyfriend after being released from the defendant's residential facility where LaPalm had received psychiatric treatment.[24] The

---

[20] *Id.* at 418-419 (citations omitted).

[21] *Id.* at 420.

[22] *Id.* at 421.

[23] *Id.* at 421 n 1.

[24] *Swan, supra* at 191-193.

plaintiff, as personal representative of the decedent's estate, sued the defendant, alleging that it negligently treated LaPalm, thereby proximately causing the decedent's death.[25] Relying on *Jenks*, this Court affirmed the trial court's grant of summary disposition in the defendant's favor on the ground that MCL 330.1946 served "as a bar to the plaintiff's suit because, pursuant to the statute, it owed no duty to the decedent."[26] More specifically, this Court explained that the defendant owed no duty to warn or protect the decedent under the terms of the statute because LaPalm never communicated a threat against the decedent.[27] This Court stated, "Under the statute, the *only* duty owed is a duty to warn in those situations where a patient communicates a threat and the object of the threat is reasonably identifiable."[28]

The *Swan* Court also rejected the plaintiff's argument that the statute did not apply because his claim against the defendant alleged negligence rather than a failure to warn. This Court explained:

> Plaintiff notes correctly that the type of claims it asserts are often brought together with a failure to warn claim, but they are separate questions. However, plaintiff's argument fails because to the extent that he alleges a breach of duties on the part of defendant, those duties were owed to LaPalm and not to the decedent, as the circuit court correctly noted. Moreover, plaintiff's argument ignores the last sentence of MCL 330.1946(1) . . . , which provides, "Except as provided in this section, a mental health professional does not have a duty to warn a third person of a threat as described in this subsection *or to protect the third person.*" (Emphasis added.) We believe that this language is unam-

---

[25] *Id.* at 193-194.

[26] *Id.* at 197-199.

[27] *Id.* at 198-199.

[28] *Id.* at 198 (emphasis added).

biguous and clearly limits the duty a mental health profes-
sional owes to third persons to the duty to warn identifiable
third persons "as provided in this section . . . ." Plaintiff
cannot claim the benefit of any alleged breach of duty to
LaPalm, and the statute plainly provides that defendant
did not owe a duty to the decedent.[29]

This Court also acknowledged but rejected the plain-
tiff's position to the extent that it could be interpreted
as arguing that defendant owed a common-law, rather
than a statutory, duty to the decedent.[30] More specifi-
cally, this Court concluded that even under the common
law the defendant had no duty to warn or protect the
decedent because no foreseeable danger to decedent, or
any other third person, was made known during
LaPalm's treatment.[31] In so ruling, this Court again
declined to "decide whether a common-law duty sur-
vived the enactment of the statute[.]"[32]

Thus, this case presents this Court with an opportu-
nity to resolve a recurring issue of contention regarding
a plaintiff's ability to sue a psychiatrist (or other
mental-health professional) outside the limitation im-
posed by the statute.

### E. THE PSYCHIATRIST'S COMMON-LAW DUTY TO PROTECT *THIRD PERSONS* FROM PATIENTS

We conclude that a plain reading of MCL 330.1946
indicates that the statute was intended to modify the
common-law duty to warn or protect third persons from
a patient that arises out of the special relationship
between a psychiatrist and that patient. The second
sentence of subsection 1 clearly states that a mental-

[29] *Id.* at 199 (citations omitted).

[30] *Id.* at 199-200.

[31] *Id.* at 200-201.

[32] *Id.* at 200.

health professional has no duty to "warn" or "protect" a "third person," *except as provided under MCL 330.1946*. Thus, the Legislature has clearly stated its intent to preempt a mental-health professional's common-law duty to warn or protect third persons. Indeed, Dawe concedes this interpretation. However, because Dawe alleges ambiguity in the phrase "third person," this conclusion does not end our inquiry.

### F. THE PSYCHIATRIST'S COMMON-LAW DUTY TO PROTECT *PATIENTS* FROM OTHER PATIENTS

Dawe argues that MCL 330.1946 addresses only the duty that arises from the relationship between a psychiatrist and a dangerous patient while specifically preserving other duties and, therefore, does not abrogate or modify the common-law duty to treat other patients within the applicable professional standard of care, which includes a duty to provide a safe clinical environment for patients. We disagree.

As mentioned, Dawe concedes that "MCL 330.1946 explicitly governs the issue of" a mental-health professional's duty when a patient communicates a threat of violence against a reasonably identifiable third person, and therefore concedes that it is clear that the Legislature intended to modify a mental-health professional's common-law duty to warn or protect those *third persons*. But she contends that it is not at all clear that the Legislature intended to modify or abrogate every common-law duty that a mental-health professional may have to protect the mental-health professional's *other patients*.

In support of her position, Dawe finds it significant that under subsection 5, the Legislature expressly stated, "This section [MCL 330.1946] does not affect a duty a mental health professional may have under any

other section of law." Dawe interprets this to mean that the Legislature clearly contemplated that some duties would remain despite the language of MCL 330.1946(1), which purports to eliminate all duties to "warn" or "protect" "third persons." In other words, Dawe would have us conclude that MCL 330.1946(1) only addresses a mental-health professional's duty to warn or protect *third persons* from a patient arising from the mental-health professional's relationship *with that patient* who may pose a danger to the *third person,* but that the statute does not modify any common-law duties that the mental-health professional may have to protect *another patient* based on the mental-health professional's relationship with *that patient* (e.g., a psychiatrist's duty to render professional care).

Thus, the issue essentially boils down to whether the term "third person" in MCL 330.1946(1) includes the psychiatrist's other patients.

The second sentence of MCL 330.1946(1) expressly states: "Except as provided in this section, a mental-health professional does not have a duty to warn a third person of a threat as described in this subsection or *to protect the third person.*" (Emphasis added.) The phrase "third person" is defined as "the grammatical person used in an utterance in referring to *anyone* or anything other than the speaker or the one or ones being addressed."[33] Reading the phrase in context and employing a common usage of the phrase "third persons" lead to the inevitable conclusion that the phrase encompasses all other persons who are neither the dangerous patient nor the mental-health professional. Accordingly we can only conclude that the Legislature intended the term "third persons" to include those third persons who

---

[33] *Random House Webster's College Dictionary* (2000) (emphasis added).

might also happen to be the psychiatrist's patient. Therefore, we conclude that the statute applies both to "third persons" who are members of the public at large and to "third persons" who are also the psychiatrist's patients. To read "third persons" as not including other patients employs a strained reading of the language and contravenes the dictate that we may not speculate regarding the intent of the Legislature beyond the language expressed in the statute.[34]

Thus, we believe that the statute was specifically intended to expressly limit a mental-health practitioner's duty to that *"as provided in this section,"* thereby limiting a mental-health practitioner's *only* duty to protect to *only* those readily identifiable persons against whom a threat of physical violence is made.[35] In other words, we believe that it is clear that the Legislature intended to modify or abrogate any other conceivable duty that a mental-health professional may have to protect others, which would include a duty to take reasonable steps to ensure that the patient is treated in a safe clinical environment. The duty a mental-health professional owes to protect third persons does not vary depending on the cause of action, nor on the identity or category of the "third person."

Further, we disagree that subsection 5 of the statute, in which the Legislature stated, "This section does not affect a duty a mental health professional may have under any other section of law," supports a conclusion that the Legislature contemplated that some common-

---

[34] *Lash v Traverse City,* 479 Mich 180, 194; 735 NW2d 628 (2007).

[35] See *Swan, supra* at 198 ("Under the statute, the *only* duty owed is a duty to warn in those situations where a patient communicates a threat and the object of the threat is reasonably identifiable."); *Jenks, supra* at 419 ("It is apparent from the language of the statute and its legislative history that it is intended to protect only those readily identifiable individuals against whom a threat of physical violence is made.").

law duties would remain despite the language of MCL 330.1946(1). To the contrary, reading the plain language of the statute indicates that the Legislature merely contemplated that a psychiatrist's other *statutory* duties remain viable—for example, the duty to report suspected abuse under the Child Protection Law.[36] More specifically, subsection 5 begins with the words "[t]his *section,*" clearly referring to the statute, MCL 330.1946, as "[t]his section." Subsection 5 then concludes with the words "under *any other section* of law[.]" The Legislature's decision to use the word "section" again here clearly indicates that it was again referring to statutory law, rather than common law.

### G. CONCLUSION

In sum, we conclude that no common-law duty to protect survived the Legislature's enactment of MCL 330.1946. We conclude that MCL 330.1946 preempts the field on the issue of a mental-health professional's duty to warn or protect others, including the psychiatrist's other patients. We therefore conclude that Dawe's claim that defendants breached their duty to provide Dawe with a safe clinical environment for her treatment is without merit. Consequently, we conclude that the trial court erred when it refused to grant defendants' requests for relief premised on the theory that they had no common-law duty to protect Dawe beyond that imposed by MCL 330.1946.

### H. UNFAIR RESULT

We acknowledge that the evidence presented at trial was compelling proof that defendants knew or should have known that Brooks posed a danger to the other

---

[36] MCL 722.623.

patients in his therapy group and, therefore, should not have been placed in group therapy. Therefore, it is an unfair result to shield defendants from liability in this case. Common sense and the general tenets of the common-law duty to protect arising out a special relationship would seem to justify holding defendants accountable here. However, we are bound to interpret plain statutory language as written. The plain language of the statute dictates the result we reach today, and any arguments that the statute is unwise or results in bad policy must be addressed to the Legislature.[37]

### III. STATUTORY DUTY TO WARN OR PROTECT UNDER MCL 330.1946

Applying the language of the statute, defendants argue that Dawe failed to present evidence that Brooks communicated to defendants a threat of physical violence against Dawe. Therefore, defendants argue that the trial court erred when it declined to grant defendants' motions for summary disposition,[38] directed verdict, and JNOV on Dawe's claim under MCL 330.1946.

In interpreting MCL 330.1946, this Court has clarified that "[i]t is apparent from the language of the statute and its legislative history that it is intended to protect only those readily identifiable individuals against whom a threat of physical violence is made."[39] Accordingly, communication of a threat of physical

---

[37] See *Oakland Co Bd of Rd Comm'rs v Michigan Prop & Cas Guaranty Ass'n*, 456 Mich 590, 613; 575 NW2d 751 (1998); *Richter v Turlow*, unpublished opinion per curiam of the Court of Appeals, issued October 1, 1999 (Docket No. 210922), p 2.

[38] Because defendants do not substantively address their motion for summary disposition, we limit our analysis to whether the trial court should have granted defendants' motion for a directed verdict.

[39] *Swan, supra* at 198, citing *Jenks, supra* at 419.

violence directed against the victim is essential to liability under the statute.[40]

Applying the statutory criteria to this case, we conclude that Dawe failed to present evidence from which a reasonable jury could conclude that Brooks communicated a threat of physical violence against Dawe to defendants. The only relevant testimony was that of James Stanislaw, a certified social worker employed by defendants, who served as the therapist for the group that included Brooks and Dawe. And although Stanislaw's testimony, even taken in the light most favorable to Dawe,[41] established that Brooks probably indicated that he wanted to hurt *someone* at the practice, his testimony did not establish that Brooks made a threat of physical violence *against Dawe,* either individually or as a member of the therapy group. Therefore, we conclude that Dawe failed to present evidence from which a reasonable jury could conclude that Brooks communicated to defendants a threat of physical violence against Dawe, as a readily identifiable third person. Thus, Dawe failed to establish a claim as a matter of law under MCL 330.1946. Consequently, the trial court should have granted defendants' motion for directed verdict on this claim.

Given the resolution of this issue, we decline to address defendants' argument that the statutory claim should have been dismissed because Dawe failed to present expert testimony concerning the standard of care applicable under MCL 330.1946. Further, we find it unnecessary to address whether the trial court erred in failing to grant defendants' motion for JNOV.

---

[40] See *Lagow ex rel Welch v Segue, Inc,* unpublished opinion per curiam of the Court of Appeals, issued August 17, 2001 (Docket No. 219624).

[41] See *Reed v Yackell,* 473 Mich 520, 528; 703 NW2d 1 (2005).

IV. CONCLUSION

The trial court erred by failing to grant defendants a directed verdict. Therefore, we vacate the lower court judgment against defendants, reverse the trial court's denial of defendants' motion for a directed verdict, and remand for entry of an order dismissing Dawe's claims against defendants. Given our disposition, we decline to address the parties' remaining arguments regarding errors related to the trial and judgment.

Reversed, judgment vacated, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

KELLY, J., concurred.

SMOLENSKI, P.J. (*dissenting*). Because I do not agree that MCL 330.1946 preempts plaintiff Elizabeth Dawe's common-law medical malpractice claim and conclude that there were no errors warranting a new trial, I cannot agree with the majority's decision to vacate the judgment against defendants. Therefore, I must respectfully dissent.

I. PREEMPTION OF PLAINTIFF'S MEDICAL MALPRACTICE CLAIM

On appeal, defendants argue that MCL 330.1946 preempts plaintiff's malpractice claim. Specifically, defendants contend that the only duty that defendants owed to plaintiff with respect to Brooks's conduct was the duty imposed by MCL 330.1946. I cannot agree.

Plaintiff originally sued defendants under two theories: statutory liability for failure to warn under MCL 330.1946 and common-law medical malpractice based on a failure to warn. However, as the case proceeded, plaintiff's medical malpractice claim evolved. At trial,

plaintiff continued to argue that defendants breached their duty to warn under MCL 330.1946. But, rather than argue that defendants also had a duty to warn under the common law, plaintiff argued that defendants breached their common-law duty to treat plaintiff within the applicable standard of care. Specifically, plaintiff contended that defendants breached the standard of care by placing Brooks in plaintiff's group therapy sessions when they knew or should have known that Brooks was a danger to the other group members. Hence, by the time of trial, plaintiff's common-law claim was no longer premised exclusively on defendants' failure to warn or protect Dawe from the danger posed by Brooks. Instead, plaintiff's claim was premised on defendants' decision to negligently expose her to a dangerous patient in a group therapy setting. Because this claim implicates both defendants' common-law duty to protect third parties from patients and defendants' duty to properly treat plaintiff, I will examine whether and to what extent MCL 330.1946(1) affected each theory of liability.

### A. STANDARDS OF REVIEW

"The common law, which has been adopted as part of our jurisprudence, remains in force until amended or repealed." *Wold Architects & Engineers v Strat*, 474 Mich 223, 233; 713 NW2d 750 (2006), citing Const 1963, art 3, § 7. Whether a statute abrogates or modifies the common law is matter of legislative intent. *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006). When the Legislature exercises its authority to modify the common law, "it should speak in no uncertain terms." *Id.* Further, legislative amendment of the common law is not lightly presumed. *Wold, supra* at 233. Finally, statutory interpretation is an

issue of law that is reviewed de novo. *Shinholster v Annapolis Hosp*, 471 Mich 540, 548; 685 NW2d 275 (2004).

### B. ANALYSIS

The common law imposes on all persons a general obligation to refrain from engaging in negligent conduct—to act reasonably in light of the apparent risk to others. See *Moning v Alfono*, 400 Mich 425, 437; 254 NW2d 759 (1977). It does not, however, normally obligate one person to protect another from third parties. *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988).[1] But a duty to protect another from harm caused by a third person may arise from "a 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury." *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997). One such special relationship is the one between a psychiatrist and a patient, which gives rise to "a duty of reasonable care to a person who is foreseeably endangered by [the psychiatrist's] patient." *Davis v Lhim*, 124 Mich App 291, 301; 335 NW2d 481 (1983), rev'd on other grounds sub nom *Canon v Thumudo*, 430 Mich 326 (1988). Hence, under the common law, "when a psychiatrist determines or, pursuant to the standard of care of his profession, should determine that his patient poses a serious danger of violence to a readily identifiable person, the psychiatrist has a duty to use reasonable care to protect that individual against danger." *Lhim*, supra at 305.

---

[1] The distinction is one of nonfeasance, or failing to intervene, versus misfeasance, which is actively setting events in motion that lead to the harm. *Williams*, supra at 498.

With the enactment of MCL 330.1946(1), our Legislature modified this common-law duty to protect third parties:

> If a patient communicates to a mental health professional who is treating the patient a threat of physical violence against a reasonably identifiable third person and the recipient has the apparent intent and ability to carry out that threat in the foreseeable future, the mental health professional has a duty to take action as prescribed in [MCL 330.1946(2)]. Except as provided in this section, a mental health professional does not have a duty to warn a third person of a threat as described in this subsection or to protect the third person.

With this statute, the Legislature accomplished two things: it established a statutory duty for mental-health professionals to warn or protect others on the basis of the mental-health professional's relationship with certain patients, and it abrogated any common-law duty to warn or protect third parties from these patients except as provided under the statute.

The first sentence of MCL 330.1946(1) establishes a statutory duty for mental-health professionals to warn or protect third parties. Under this provision, a mental-health professional has a duty to take the steps listed under MCL 330.1946(2) if (1) the mental-health professional is treating a patient, (2) the patient communicates to the mental-health professional (3) a threat of physical violence (4) against a reasonably identifiable third person, and (5) the "recipient" has the apparent intent and ability to carry out the threat in the foreseeable future. Further, the second sentence clearly provides that, except as provided by the first sentence, a mental-health professional does not have a duty "to warn a third person of a threat as described in this subsection or protect the third person." MCL 330.1946(1). Hence, the second sentence abrogates a

mental-health professional's common-law duty to warn or protect third persons from dangerous patients. But, by referring to the threats described under the first sentence and noting that the mental-health professional does not have a duty to warn of those threats or otherwise protect "*the* third person" threatened "as described," the Legislature limited application of MCL 330.1946(1) to those instances involving patients who meet the criteria described under the first sentence.

In 1995, the Legislature amended MCL 330.1946 to change the third use of the word "patient" in sentence one to "recipient." See 1995 PA 290. All other references to "patient" in the statute were left unaltered. The term "recipient" is defined to mean "an individual who receives mental health services from the department, a community mental health services program, or a facility or from a provider that is under contract with the department or a community mental health services program." MCL 330.1100c(12). Not all patients of mental-health professionals will qualify as recipients, see *Saur v Probes*, 190 Mich App 636, 641; 476 NW2d 496 (1991) (construing former MCL 330.1700, which defined "recipient" in a substantially similar way to present MCL 330.1100c[12]). Hence, the duty imposed under the first sentence of MCL 330.1946(1) applies only to mental-health professionals who are treating patients who are also "recipients" within the meaning of MCL 330.1100c(12). Accordingly, the second sentence necessarily only modified the common-law duties applicable to mental-health professionals who are treating recipients.

In the present case, there is no evidence that Brooks was a recipient within the meaning of MCL 330.1100c(12) during the period defendants treated him. Because Brooks was not a recipient, MCL

330.1946(1) did not modify defendants' common-law duty to protect third parties from Brooks. Consequently, MCL 330.1946(1) did not abrogate or modify plaintiff's common-law claim.

Even if MCL 330.1946(1) could be said to apply to all patients, even those patients who do not qualify as recipients, by its own terms, MCL 330.1946(1) only modifies a mental-health professional's common-law duty to warn or protect third parties from the acts of others. It does not apply to a mental-health professional's duty to refrain from harming a third party through his or her own negligent acts—even where the ultimate harm is perpetrated by the mental-health professional's patient. See *Williams*, *supra* at 498 (noting that courts have made a distinction between "misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm"). As already noted, all persons have a common-law duty to refrain from actively endangering others by their conduct. *Moning*, *supra* at 437. This includes actions that foreseeably lead to the infliction of harm by others against a third party. See *Davis v Thornton*, 384 Mich 138; 180 NW2d 11 (1970) (holding that the defendant may be liable for the harms inflicted by a group of minors who stole defendant's car after he left the car unlocked with the keys inside); *Ross v Glaser*, 220 Mich App 183; 559 NW2d 331 (1996) (holding that a father may be civilly liable for a murder committed by his son, who had a history of mental illness, where the father provided a loaded gun to his son while the son was in an agitated state); *Pamela L v Farmer*, 112 Cal App 3d 206, 209-211; 169 Cal Rptr 282 (1980) (stating that a wife, who knew that her husband had a history of molesting children, could be liable for placing minors in danger by encouraging them to use her home and swimming pool while she was at work and

her husband was home alone); *Bryson v Banner Health Sys*, 89 P3d 800, 804-805 (Alas, 2004) (recognizing that a treatment provider may be liable for placing a known rapist into a therapy group with a woman and then encouraging them to interact outside group therapy). Under the majority's interpretation of MCL 330.1946(1), except to the extent provided by MCL 330.1946(1), a mental-health professional would have no common-law duty to refrain from negligently placing another in danger of harm at the hands of that mental-health professional's patients. Thus, a psychiatrist would have no duty to refrain from leaving his keys in his unlocked car for a patient to steal, see *Thornton, supra*, to refrain from giving a loaded weapon to an agitated patient, see *Ross, supra*, to refrain from encouraging minors to associate with a pedophile patient, see *Pamela L, supra*, or from placing a known rapist-patient into group therapy with a woman and then encouraging her to associate with the rapist-patient outside group sessions, *Bryson, supra*. I cannot give MCL 330.1946(1) such a broad interpretation. Rather, I conclude that MCL 330.1946(1) does not abrogate a mental-health professional's duty to refrain from *actively* placing a third party in danger of harm at the hands of the mental-health professional's patients.

### C. CONCLUSION

Because MCL 330.1946 does not apply to patients such as Brooks, who are not also recipients, and does not affect a mental-health professional's common-law duty to refrain from actively placing another in danger of harm at the hands of a patient, plaintiff's claim that defendants breached their duty to properly provide plaintiff with a safe clinical environment for her treatment remained viable. Consequently, I conclude that

the trial court did not err when it refused to grant
defendants' requests for relief premised on the theory
that they had no common-law duty to protect plaintiff
beyond that imposed by MCL 330.1946. Because my
resolution of this issue is not dispositive of the appeal, I
will address the remaining issues raised by the parties.

## II. DIRECTED VERDICT OF THE STATUTORY DUTY TO WARN

Defendants argue that the trial court erred when it
declined to grant defendants' motions for a directed
verdict and judgment notwithstanding the verdict
(JNOV) of plaintiff's claim under MCL 330.1946. This
Court reviews de novo a trial court's decisions regard-
ing a party's motions for directed verdict and JNOV.
*Reed v Yackell*, 473 Mich 520, 528; 703 NW2d 1 (2005).

As already noted, I believe that MCL 330.1946 only
applies to patients who are also recipients. Because
Brooks was not a recipient, defendants had no duty to
warn or protect plaintiff under MCL 330.1946. For that
reason, I agree that the trial court should have granted
defendants' motion for a directed verdict on that theory
of liability. However, because this error was harmless, I
conclude that it does not warrant a new trial.

Plaintiff originally sued under two separate theories
of liability: statutory liability for failure to warn under
MCL 330.1946 and common-law medical malpractice
for failure to warn. However, at trial, plaintiff argued
that defendants were liable because they breached the
professional standard of care by failing to provide a safe
clinical environment for plaintiff's treatment. To this
end, most of the testimony and evidence presented at
trial dealt with the behavior and symptoms exhibited by
Brooks and how defendants responded to those behav-
iors and symptoms. Indeed, plaintiff's counsel spent the
majority of his closing argument discussing the evi-

dence that Brooks had a serious mental disorder and, as a result, should never have been assigned to group therapy.

In addition, although plaintiff presented MCL 330.1946 as a separate theory supporting liability, the trial court did not instruct the jury that a breach of the duty imposed by MCL 330.1946 could alone support a verdict against defendants. Instead, the trial court instructed the jury that, "[i]f you find that any of the Defendants violated this statute before or at the time of the occurrence, such violation is evidence of negligence which you should consider, together with all of the evidence, in deciding whether the Defendant was negligent." Further, the trial court instructed the jury that "professional negligence or malpractice" means "the failure to do something which a psychiatrist of ordinary learning, judgment or skill in this community or a similar one would do, or the doing of something which is—a psychiatrist of ordinary learning, judgment or skill would not do under the same or similar circumstances you find to exist in this case." Hence, the only theory of liability before the jury was medical malpractice. Nevertheless, because the duty imposed by MCL 330.1946 did not apply to the facts of this case, the trial court erred when it instructed the jury that it could consider a breach of this statute to be evidence that defendants were negligent.

On appeal, defendants argue that, if this Court concludes that the jury should not have been instructed on MCL 330.1946, this Court must grant defendants a new trial because "it cannot be known whether the jury awarded damages based on the unsupported statutory claim . . . ." I do not agree. The trial court did not instruct the jury on separate theories of liability. Hence, defendants' reliance on authorities discussing the erro-

neous submission of a claim on a general verdict form is inapposite. See *Tobin v Providence Hosp*, 244 Mich App 626; 624 NW2d 548 (2001), and *Berwald v Kasal*, 102 Mich App 269; 301 NW2d 499 (1980). Instead, the relevant inquiry is whether the trial court's erroneous instruction caused defendants such unfair prejudice that it would be "inconsistent with substantial justice" to refuse to grant defendants a new trial. *Ward v Consolidated R Corp*, 472 Mich 77, 84; 693 NW2d 366 (2005); MCR 2.613(A). Because the overwhelming evidence supported plaintiff's medical malpractice claim and there was little evidence involving plaintiff's claim under MCL 330.1946, I cannot conclude that this instruction caused defendants unfair prejudice.

In his video trial deposition, Dr. Mark Fettman, who is plaintiff's psychiatric expert, testified that a psychiatrist has a duty to take reasonable precautions for the protection of patients. Included within this duty is the requirement that the psychiatrist assess a patient to determine if the patient is a suitable candidate for group therapy before placing him or her into a group. Once a patient has been placed in group therapy, the psychiatrist has a further duty to continually assess the patient to ensure that the patient remains suitable for group therapy. Consistent with this testimony, plaintiff's proofs largely consisted of evidence concerning what defendants knew or should have known about Brooks's mental health and how defendants used that information.

Testimony and records submitted to the jury established that Brooks was institutionalized after he attempted suicide in 1992. Dr. Joseph Gluski testified that Brooks was referred to his practice after Brooks left the group home. Gluski stated that he treated Brooks from April 1994 to October 1995. Gluski testified that Brooks

was on antipsychotic medications when he arrived at the practice and that he determined that Brooks should remain on antipsychotic medications during treatment. Gluski acknowledged that he wrote in Brooks's chart that Brooks had mentally slipped back into 1992, which was the year he tried to commit suicide, around the time that he ceased taking his medications. Gluski also testified that Brooks appeared to misunderstand how he was being treated in group therapy and thought that the others were conspiring against him. Gluski stated that Brooks abruptly stopped treatment in October 1995.

Gluski also described two incidents with Brooks returning to his office after treatment was over. Gluski testified that in the summer of 1996, Brooks called and asked to have a meeting with Gluski and Anika Kirby, the therapist who led Brooks's group therapy sessions. At the meeting, Brooks asked questions about Kirby's ethnic background, which was Finnish. Brooks had even brought a map of Finland with him.

Gluski further testified about an incident that occurred in the summer of 1997 or 1998.[2] Gluski testified that Brooks barged into his office before normal office hours and began searching the office for Kirby. Gluski stated that Brooks seemed agitated and thought he might get physical. Gluski testified that Brooks seemed furious and made comments about his treatment in group therapy. Gluski left the office and walked to a nearby restaurant, but Brooks followed him and did not leave until Gluski called the police. Gluski acknowledged that the police report indicated that Gluski told the officer that Brooks had said, "You better run." The report also indicated that Brooks told him, "I want to get your partner."

---

[2] Gluski stated that he recalled that it occurred in 1997, but the associated police report was dated July 1, 1998.

Gluski testified that, after Brooks began treating
with defendants, Reuvan called about Brooks. Gluski
said he told Reuvan about the incidents with Brooks
and warned him that Brooks was dangerous. Gluski
said he also told Reuvan that, if Reuvan decided to treat
Brooks, Brooks should be in individual treatment for
one full year and needed to be on medication. Gluski
stated that he was so concerned about the situation that
he called Reuvan the next day to reiterate that Reuvan
should be careful.

In addition to Gluski's testimony, plaintiff presented
evidence that, on October 19, 1998, Brooks came to
defendants' office and told Joseph Froslie, who was a
therapist at the practice, that he had obtained a gun
and driven to New Hampshire with an intent to kill his
ex-girlfriend's mother and then commit suicide. In
response to this revelation, Froslie asked Brooks to
bring the gun into the office, which Brooks did. After
Brooks brought the gun to the office, Froslie contacted
Dr. Leora Bar-Levav (Leora), who was Reuvan's daugh-
ter and also a psychiatrist at Reuvan's practice. Leora
performed a general mental-status examination of
Brooks. Although Leora prescribed a two-week supply
of medication after this incident and claimed to have
performed further assessments of Brooks, the jury
heard evidence that these subsequent assessments were
not documented and that no one at defendants' practice
recalled ever having a specific discussion about Brooks.
Hence, the jury could have concluded that no other
steps were taken to ensure that Brooks was not a
danger to himself or others. Notwithstanding these
prior incidents, in December 1998, Reuvan decided to
place Brooks in group therapy. Testimony established
that Reuvan made the decision after consulting with
the other staff members.

Froslie testified that Brooks exhibited some narcissistic behavior and also had disturbances in social functioning. James Stanislaw, another group therapist at the practice, testified that Brooks had some symptoms that were consistent with paranoid schizophrenia, including confused thinking and suspiciousness, and that he was not always appropriate or responsive in group therapy. Froslie also indicated that Brooks sometimes did not appear to understand the group therapy process. Brooks was finally discharged from the practice in March 1999 after Reuvan prescribed medication to Brooks, which Brooks refused to take.

This evidence is compelling proof that defendants knew or should have known that Brooks posed a danger to the other patients in his therapy group and, therefore, should not have been placed in the group. In contrast, the evidence tending to support plaintiff's claim under MCL 330.1946 was limited. Hence, it is not likely that the jury relied on a purported violation of MCL 330.1946 to conclude that defendants breached the standard of care. Furthermore, the testimony concerning threats was relevant to the underlying medical malpractice claim, even though the evidence was inadequate to establish the existence of a duty imposed under MCL 330.1946, because the threatening behavior is additional evidence from which a jury could conclude that defendants failed to continually assess whether Brooks should be in group therapy. Yet, by instructing the jury that it could only consider threats under MCL 330.1946 as evidence of negligence, the jury may have concluded that it could not consider the fact that Brooks expressed threatening feelings unless those threats constituted a violation of MCL 330.1946. Hence, the instruction may have benefited defendants' case. For this reason, I would conclude that the erroneous in-

struction did not prejudice defendants and that a new trial is not warranted on that basis. *Ward, supra* at 84.

### III. COMMON-LAW DUTY AND PROXIMATE CAUSE

Defendants also argue that Brooks's criminal conduct was not foreseeable. Because Brooks's conduct could not be foreseen, defendants had no duty to protect plaintiff and any failures on their part were not the proximate cause of plaintiff's injuries. For these reasons, defendants further argue, as a matter of law, they cannot be held liable for plaintiff's injuries. Again, I would disagree.

### A. STANDARD OF REVIEW

Whether defendants owed a duty to plaintiff is a question of law, which this Court reviews de novo. *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

### B. DEFENDANTS' PROFESSIONAL DUTY TO PLAINTIFF

It is well established that a "negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Riddle v McLouth Steel Products Corp*, 440 Mich 85, 96; 485 NW2d 676 (1992). " 'Duty' comprehends whether the defendant is under *any* obligation to the plaintiff to avoid negligent conduct; it does not include—where there is *an* obligation—the nature of the obligation: the general standard of care and the specific standard of care." *Moning, supra* at 437. Courts will traditionally examine various competing policy factors in determining whether a duty should be imposed. These include: " ' "the relationship of the par-

ties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." ' " *In re Certified Question from the Fourteenth District Court of Appeals of Texas*, 479 Mich 498, 505; 740 NW2d 206 (2007), quoting *Dyer v Trachtman*, 470 Mich 45, 49; 679 NW2d 311 (2004), quoting *Murdock, supra* at 53. For purposes of duty, a risk is foreseeable if a reasonable person could anticipate that a particular event would occur and that the event posed a risk of injury or harm to a person or property. *Samson v Saginaw Professional Bldg, Inc,* 393 Mich 393, 406; 224 NW2d 843 (1975).

In cases involving a traditional relationship between a medical professional and a patient, the law imposes a duty on the medical professional to treat the patient within the standard of care generally applicable to medical professionals. See *Dyer, supra* at 49-50. It is undisputed that defendants had an established psychiatrist-patient relationship with plaintiff. Given this relationship, defendants generally owed a duty to treat plaintiff within the standard of care applicable to medical professionals. *Id.* Hence, defendants were required to " 'exercise that degree of skill, care and diligence exercised by members of the same profession, practicing in the same or similar locality, in light of the present state of medical science.' " *Bryant v Oakpointe Villa Nursing Ctr, Inc,* 471 Mich 411, 424; 684 NW2d 864 (2004), quoting *Adkins v Annapolis Hosp,* 116 Mich App 558; 323 NW2d 482 (1982); see also MCL 600.2912a (codifying the standard of care).

At some point in the course of plaintiff's treatment, defendants made the decision to treat plaintiff with group therapy and specifically to include Brooks in plaintiff's group. The decision to pursue a particular course of treatment involves considerations of professional medical judgment that implicate defendants'

duty to provide proper medical care to plaintiff. See
*Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26,
46-47; 594 NW2d 455 (1999). In the group therapy
setting, it is foreseeable that a patient who is not
mentally healthy enough to participate in group
therapy may be or become a danger to the other
members of the group. Because plaintiff was among the
class of persons who could foreseeably be harmed by
defendants' decision to place Brooks in group therapy,
as a matter of law, defendants owed plaintiff a duty to
act within the applicable standard of care. See *Moning*,
*supra* at 439 (noting that a duty will not be imposed
unless "it is foreseeable that the actor's conduct may
create a risk of harm to the victim"). Thus, a mental-
health professional's duty to treat a patient within the
applicable standard of care includes a duty to take
reasonable steps to ensure the safety of its patients
during treatment. This includes a duty to take reason-
able steps to ensure that the patients placed in group
therapy do not pose a danger to the other members of
the group. Although it is for the court to decide ques-
tions of duty,[3] "the jury decides whether there is cause
in fact and the specific standard of care: whether
defendants' conduct in the particular case is below the
general standard of care, including . . . whether in the
particular case the risk of harm created by the defen-
dants' conduct is or is not reasonable." *Id.* at 438.

---

[3] Under some circumstances, whether a defendant owes a duty to the
plaintiff will turn on factual findings. In those cases, the jury must make
the necessary factual findings. See *MacDonald v PKT, Inc*, 464 Mich 322,
339; 628 NW2d 33 (2001) (noting that the plaintiff presented sufficient
factual evidence from which a jury could conclude that plaintiff was a
member of the class of persons to which the landlord owed a duty, but
concluding that defendant satisfied its duty by having the police present);
*Bonin v Gralewicz*, 378 Mich 521, 527-528; 146 NW2d 647 (1966) (noting
that whether the defendant had knowledge that there was a foreseeable
risk of harm to others was a question of fact for the jury).

Accordingly, it was for the jury to decide whether defendants' decision to place Brooks in group therapy with plaintiff fell below the general standard of care applicable to medical professionals and whether that decision was the cause of plaintiff's injuries.

### C. FORESEEABILITY AS AN ELEMENT OF PROXIMATE CAUSE

In order to prevail in an ordinary negligence action, the plaintiff must also prove that the defendant's breach of duty proximately caused the plaintiff's injuries. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). Likewise, in a medical malpractice action, the plaintiff must prove that the defendant's breach of the applicable standard of care proximately caused the plaintiff's injuries. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). Unless reasonable minds could not differ regarding the proximate cause of the plaintiff's injury, proximate cause is a question for the jury. *Nichols v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002). Proximate cause entails proof of two separate elements: (1) cause in fact and (2) legal or proximate cause. *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994).

> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. A plaintiff must adequately establish cause in fact in order for legal cause or "proximate cause" to become a relevant issue. [*Id.* at 163 (citations omitted).]

In the present case, the "cause in fact" element is not in dispute. Rather, defendants argue that plaintiff failed to prove proximate cause as a matter of law. Specifically,

defendants contend that criminal acts are not foreseeable and that Brooks's criminal acts in particular were too remote in time from defendants' alleged breach to constitute a proximate cause of plaintiff's injuries.

In order for negligence to be the legal or proximate cause of an injury, " 'the injury must be the natural and probable consequence of a negligent act or omission, which under the circumstances, an ordinary prudent person ought reasonably to have foreseen might probably occur as a result of his negligent act.' " *Paparelli v Gen Motors Corp*, 23 Mich App 575, 577; 179 NW2d 263 (1970), quoting *Nielsen v Henry H Stevens, Inc*, 368 Mich 216, 218; 118 NW2d 397 (1962). There may be more than one proximate cause of an injury. *Allen v Owens-Corning Fiberglas Corp*, 225 Mich App 397, 401-402; 571 NW2d 530 (1997). "When a number of factors contribute to produce an injury, one actor's negligence will not be considered a proximate cause of the harm unless it was a substantial factor in producing the injury." *Brisboy v Fibreboard Corp*, 429 Mich 540, 547; 418 NW2d 650 (1988).

With regard to proximate cause, defendants argue that criminal acts are not foreseeable as a matter of law. However, courts in Michigan have long recognized that criminal acts by third parties can be foreseeable. See *Hersh v Kentfield Builders, Inc*, 385 Mich 410, 415; 189 NW2d 286 (1971) (stating that, whether the defendant employer knew or should have known of its employee's dangerous propensities and, therefore, should be held liable for the employee's criminal assault, was a question for the jury); *Samson, supra* at 407-408, 409 (stating that whether the criminal acts of a patient-visitor to the landlord's premises were foreseeable was properly a jury question); *Thornton, supra* at 149 (stating that reasonable people might conclude that the

defendant's act of leaving his keys in an unlocked car, which was later stolen and involved in an accident, was "not too remote a cause of the plaintiff's injuries and that the joyrider's intervention did not sever that causal connection"); *Ross, supra*. Further, although the length of time between the shooting and Brooks's departure from defendants' care is relevant to whether defendants' placement of Brooks in plaintiff's group constituted a proximate cause of plaintiff's injuries, it is not dispositive. See *Michigan Sugar Co v Employers Mut Liability Ins Co of Wisconsin*, 107 Mich App 9, 15; 308 NW2d 684 (1981) ("Lapse of time does not foreclose the cause of an injury from being its proximate cause."). Plaintiff presented evidence that defendants knew or should have known that Brooks would form improper emotional attachments to persons in his group therapy and that he might seek out those persons long after the termination of his participation in the group. Given this evidence, a reasonable jury could conclude that defendants' breach of the standard of care foreseeably included the possibility that Brooks would return long after the conclusion of his participation in group therapy and harm persons with whom he formed these attachments. Therefore, the lapse of time alone was insufficient to render Brooks's actions unforeseeable as a matter of law. *Id.* Because a reasonable jury could conclude that defendants proximately caused plaintiff's injury by placing Brooks in the therapy group or by failing to take reasonable precautions to protect plaintiff from Brooks, the trial court did not err in refusing to grant defendants' motion for JNOV on this basis. *Nichols, supra* at 532.

IV. IMPROPER TESTIMONY CONCERNING
DEFENDANTS' DUTY TO BROOKS

Defendants next argue that the trial court improperly permitted plaintiff to present evidence that defen-

dants breached their duty to treat Brooks within the applicable standard of care. I find no merit to this argument.

Plaintiff did not present evidence or argue that defendants failed to properly treat Brooks. Plaintiff presented evidence that Brooks had symptoms and exhibited behavior that indicated that Brooks was not suitable for group therapy. Plaintiff further presented evidence that Brooks was placed in group therapy without first requiring him to go through a lengthy period of individual treatment and taking proper medication. Although this evidence permits an inference that defendants failed to properly treat Brooks, the evidence was relevant to plaintiff's theory of the case. MRE 401; MRE 402. Therefore, there was no error.

### V. GREAT WEIGHT OF THE EVIDENCE

Defendants next argue that the verdict against Dr. Leora Bar-Levav was against the great weight of the evidence. Again, I disagree.

This Court reviews a trial court's denial of a motion for a new trial on the ground that the jury's verdict was against the great weight of the evidence for an abuse of discretion. *Campbell v Sullins*, 257 Mich App 179, 193; 667 NW2d 887 (2003). In deciding whether to grant a motion for a new trial, the trial court's function is to "determine whether the overwhelming weight of the evidence favors the losing party." *Phinney v Perlmutter*, 222 Mich App 513, 525; 564 NW2d 532 (1997). In reviewing the trial court's decision, this Court will give substantial deference to the trial court's conclusion that a verdict was not against the great weight of the evidence. *Id.*

At trial, Fettman testified that the applicable standard of care required defendants to take steps to ensure that

the clinical environment was safe for plaintiff's treatment. Fettman stated that this required defendants to assess Brooks's suitability for group therapy before placing him in a therapy group and to continually assess him thereafter to determine whether he remained suitable for group therapy. Fettman testified that defendants breached the standard of care by placing Brooks in a therapy group when there were clear signs that he was not suitable for group therapy and by failing to continually assess and communicate about Brooks's continued suitability for group therapy.

Although Fettman indicated that he understood the evidence to show that Reuvan had the final decision regarding the placement of Brooks in group therapy, there was testimony that this decision was made after receiving input from all the staff members. The jury also heard evidence that Leora performed the assessment of Brooks after he disclosed that he had traveled to New Hampshire to kill his ex-girlfriend's mother. There was also evidence that suggested that Leora failed to make any subsequent assessments. Finally, evidence indicated that Leora participated in several of Brooks's group therapy sessions and yet failed to make any of the continuing assessments that Fettman testified would be required with a patient like Brooks.

From this evidence, a reasonable jury could conclude that Leora did participate to some extent in the decision to place Brooks in group therapy. A reasonable jury could also conclude that Leora breached the standard of care by failing to perform additional assessments of Brooks after the gun incident and by failing to continually reevaluate whether Brooks should be in group therapy. Finally, a reasonable jury could conclude that these breaches of the standard of care proximately caused plaintiff's injuries.

Given this evidence, I cannot conclude that the trial
court abused its discretion by declining to grant defen-
dants' motion for a new trial on the basis that the
verdict against Leora was not against the great weight
of the evidence.

### VI. TESTIMONY CONCERNING BROOKS'S MANUSCRIPT

Defendants next argue that the trial court improp-
erly permitted plaintiff's counsel to make remarks and
present testimony concerning papers sent by Brooks to
Reuvan. Defendants further contend that those re-
marks and testimony were prejudicial and warrant a
new trial. I disagree. Even if the trial court properly
determined that these papers should be excluded from
evidence, the few references made to them at trial did
not prejudice defendants. Therefore, a new trial is not
warranted on this basis.

Before trial, defendants moved in limine to preclude
plaintiff from eliciting testimony about or referring to a
document that the parties referred to as the "manu-
script." The manuscript contained Brooks's ramblings
about Reuvan's therapy techniques and Brooks's belief
that his therapists "used" him to benefit the other
members of the therapy group. In the manuscript,
Brooks wrote about his desire to seek revenge, but did
not directly threaten any one person or group. Brooks
mailed the manuscript to Reuvan one day before the
shooting. In their motion, defendants argued that evi-
dence and arguments concerning the manuscript
should be precluded because the manuscript was not
relevant. Specifically, defendants noted that the manu-
script arrived after Brooks's placement in group
therapy and contained no threat within the meaning of
MCL 330.1946. Defendants also contended that there
was no evidence that Reuvan read it. For these reasons,

defendants argued, it could not be used to support any of plaintiff's claims and should not be referred to or admitted into evidence. The trial court denied defendants' motion in limine.

At trial, defendants again moved to have the manuscript excluded. The trial court agreed that the manuscript was not relevant and also concluded that it was more inflammatory than probative. Therefore, the trial court excluded the manuscript. In addition, the trial court precluded plaintiff's counsel from asking any questions about the manuscript.

Although the trial court excluded the manuscript, plaintiff's counsel had already commented on the manuscript during his opening statement. Specifically, plaintiff's counsel stated that Brooks sent

> a manuscript, priority mail, addressed to Dr. Bar-Levav. It was received the next day. Maria Attard will tell you she handed the package to Dr. Bar-Levav. She's unsure if she opened it or he opened it, but she is certain of one thing, nobody reads his mail but him.
>
> At a later point in the day, Dr. Bar-Levav gave the manuscript back to Maria and said he's [sic] read it over the weekend. The defendants will tell you that Dr. Bar-Levav didn't have any idea what was inside the package. However, before the shooting took place, Mr. Baker will tell you that he recalls hearing that a manuscript had been received and he was advised that it was a confused document based on something Brooks had read in Dr. Bar-Levav's book.
>
> This is not something he was advised of in a formal meeting, Mr. Baker will tell you, but there was a buzz around the office, people were talking about the manuscript. What was in this manuscript, all the experts agree, is a very troubled, very confused writing that demonstrated a psychotic episode. The manuscript talks about revenge. The manuscript talks about Brooks feeling that he was being used in therapy.

Plaintiff's counsel also stated that defendants "failed to warn [plaintiff] that Brooks had made threats against her group after receiving the manuscript . . . ."[4]

After the trial court's ruling to preclude testimony concerning the manuscript, there were two brief references to the manuscript. First, a witness who testified by deposition referred to the timing of the arrival of the package. Second, plaintiff's counsel referred to the fact that the manuscript had not been submitted to the jury. He stated:

> But you may have a question in your mind, where['s] the manuscript, and you have heard reference throughout the trial, but it hasn't come into evidence.
>
> Those are the decisions, as the Judge instructed you at the beginning, he's going to tell you at the end, were made outside of your presence, and that's without respect to whether or not an attorney or myself wanted to actually present this certain evidence. For legal reasons, sometimes it doesn't come into evidence. You can't hold that against us. And at the time when we thought it was coming in, we told you you were going to see it, but that changed. But as the Judge will tell you, if he makes certain decisions on things, its not to be held against the attorneys.

On appeal, defendants argue that these references to the manuscript prejudiced defendants and warrant a new trial. However, defendants did not object to plaintiff's opening or closing remarks. Further, when redacting the deposition testimony of the witness at issue, defendants' counsel specifically asked to have certain references to the manuscript removed, which the trial court granted. But defendants' counsel did not object to

---

[4] Plaintiff's counsel also noted that if the jury found that there was "no duty to warn about the manuscript," but nevertheless concluded that defendants had a "duty to keep the clinic safe, then you must enter a decision of negligence."

or request a redaction of the deposition testimony cited on appeal. Hence, these claims of error are unpreserved.

An error in the admission or exclusion of evidence "will not warrant appellate relief 'unless refusal to take this action appears . . . inconsistent with substantial justice,' or affects 'a substantial right of the [opposing] party.' " *Craig, supra* at 76, quoting MCR 2.613(A) and MRE 103(a). Unpreserved claims that an attorney committed misconduct are analyzed to determine whether the conduct " 'may have caused the result or played too large a part and may have denied a party a fair trial.' " *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 501; 668 NW2d 402 (2003), quoting *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 103; 330 NW2d 638 (1982).

The brief mention of the manuscript that was not redacted from the deposition testimony could not have affected the jury's verdict. Therefore, even if it were plain error to permit its submission to the jury, it would not warrant any relief. MCR 2.613(A). Likewise, taken as a whole, plaintiff's attorney's remarks were minimally prejudicial and could not have had a controlling influence on the verdict. *Wiley, supra* at 505. Furthermore, the trial court instructed the jury that the attorneys' comments were not evidence. This instruction cured any minimal prejudice that these comments may have had. *Tobin, supra* at 641. There was no error warranting the requested relief.

### VII. THE APPLICABLE DAMAGES CAP

Finally, defendants argue that the trial court erred when it applied the damages cap imposed by MCL 600.1483 that was in effect on the date that the trial court entered the judgment against defendants rather than the cap in effect on the date plaintiff filed her suit. I disagree.

The amount of the cap applicable to an award of
noneconomic damages is a matter of statutory interpre-
tation that this Court reviews de novo. See *Shinholster*,
*supra* at 548.

MCL 600.1483(1) limits the total amount of noneco-
nomic damages that may be recovered by all plaintiffs
as a result of negligence arising out of an action alleging
medical malpractice. The cap was initially set at
$280,000 for injuries, such as those at issue in this case,
that do not meet the exceptions stated under MCL
600.1483(1)(a) to (c). However, under MCL 600.1483(4),
the state treasurer is required to adjust this amount
annually to reflect changes in the consumer price index.
Although the statute provides for the annual adjust-
ment of the cap, it does not address how this adjustment
affects suits that are pending but have not yet been
reduced to judgment.

In examining the applicability of the damages cap to
wrongful death actions arising from medical malprac-
tice, our Supreme Court noted that "[o]nly after the
court or jury has, in its discretion, awarded damages as
it considers fair and equitable does the court, pursuant
to [MCL 600.6304(5)], apply the noneconomic damages
cap of [MCL 600.1483]." *Jenkins v Patel*, 471 Mich 158,
172; 684 NW2d 346 (2004), citing MCL 600.6098(1) and
MCL 600.6304(5). The Court further noted that the
damages cap does not impinge on the jury's right to
determine the amount of damages, but rather only
limits the legal consequences of the jury's finding by
limiting the amount of the judgment on the verdict. *Id.*
at 173. Hence, our Supreme Court recognized that the
cap only applies to a judgment rendered after a verdict.
Because the cap applies to judgments, it follows that the
amount of the cap is the amount in effect on the date
the judgment is entered. See *Wessels v Garden Way, Inc*,

263 Mich App 642, 652-654; 689 NW2d 526 (2004)
(holding that the cap applicable to product liability
actions is determined by the date of the judgment).

The trial court did not err in applying the 2005 cap.

### VIII. CALCULATION OF PREJUDGMENT INTEREST

On cross-appeal, plaintiff argues that the trial court
did not properly calculate plaintiff's prejudgment inter-
est. I agree.

This Court reviews de novo questions of statutory
interpretation such as the proper application of MCL
600.6013 and MCL 600.1483. *Shinholster, supra* at 548.

When rendering its verdict, the jury had to make
specific findings of fact regarding the amount of past
economic damages, past noneconomic damages, future
economic damages, and future noneconomic damages
for plaintiff. MCL 600.6305(1). Future damages are
defined to be "damages arising from personal injury
which the trier of fact finds will accrue after the damage
findings are made ...." MCL 600.6301(a). Noneco-
nomic damages are defined as "damages or loss due to
pain, suffering, inconvenience, physical impairment,
physical disfigurement, or other noneconomic loss."
MCL 600.1483(3). In the present case, the jury found
that plaintiff suffered a total of $600,000 in past medi-
cal expenses[5] and $400,000 in past noneconomic dam-
ages. The jury also found that plaintiff would suffer
$1,040,000 in future noneconomic damages. The verdict
form did not provide for future economic damages.

Once the jury awarded damages, plaintiff was en-
titled to interest on her money judgment. MCL
600.6013(1). Although MCL 600.6013(8) provides that

---

[5] This amount was reduced by the trial court to $44,338.28, which was the
amount of medical expenses for which plaintiff presented evidence at trial.

interest "is calculated on the entire amount of the money judgment, including attorney fees and other costs" from the filing of the complaint, MCL 600.6013(1) specifically excludes interest "on future damages from the date of filing the complaint to the date of entry of the judgment." Hence, under a plain reading of MCL 600.6013, plaintiff would normally be entitled to interest on the full amount of her past noneconomic damages. However, in a medical malpractice action, the trial court is required to reduce an award of damages to "the amount of the appropriate limitation set forth in [MCL 600.1483]." MCL 600.6304(5). Under MCL 600.1483(1), the total noneconomic damages recoverable by plaintiff could not exceed $371,800. Because the jury found that plaintiff suffered more than $1.4 million in total noneconomic damages, the trial court had to reduce the total award for noneconomic damages to $371,800. By its plain terms, MCL 600.1483(1) applies to "the total amount of damages for noneconomic loss recoverable by all plaintiffs . . . ." However, the Legislature failed to address how MCL 600.1483(1) should be applied to separate awards of past and future noneconomic damages. This legislative silence poses no problem in cases where the jury finds either past or future noneconomic damages but not both, or where the combined total of past and future noneconomic damages does not exceed the applicable cap.[6] However, where the jury finds both past and future noneconomic damages whose combined total

---

[6] In cases where the jury finds only past noneconomic damages, the plaintiff would clearly be entitled to prejudgment interest on the full amount. MCL 600.6013(1). Likewise, in cases where the jury finds only future noneconomic damages, the plaintiff would clearly not be entitled to any prejudgment interest on that amount. *Id.* Finally, where a jury finds both past and future noneconomic damages, but the combined total does not exceed the cap provided by MCL 600.1483, the trial court would

exceeds the cap provided by MCL 600.1483, it becomes essential to a proper determination of prejudgment interest under MCL 600.6013(1) to first determine how the cap applies to the individual awards of past and future noneconomic damages.

Because MCL 600.1483 and MCL 600.6013 both relate to the trial court's entry of a judgment after a jury renders a verdict, they must be read together as though constituting one law. *State Treasurer v Schuster*, 456 Mich 408, 417; 572 NW2d 628 (1998). Nevertheless, it is clear that the statutes serve distinct purposes. The Legislature enacted MCL 600.1483 to control increases in health care costs by limiting the liability of medical care providers. *Zdrojewski v Murphy*, 254 Mich App 50, 80; 657 NW2d 721 (2002). This purpose is accomplished by *limiting* the amount of compensation that a plaintiff may obtain for noneconomic damages. In contrast, MCL 600.6013 serves two purposes: (1) to compensate the prevailing party for the loss of the use of funds awarded as a money judgment and for the costs of bringing a court action and (2) to provide an incentive for prompt settlement. *Old Orchard by the Bay Assoc v Hamilton Mut Ins Co*, 434 Mich 244, 252-253; 454 NW2d 73 (1990), overruled on other grounds by *Holloway Constr Co v Oakland Co Bd of Co Rd Comm'rs*, 450 Mich 608, 615-616 (1996). With regard to the latter purpose, our Supreme Court explained that the "award of statutory prejudgment interest . . . serves a distinct deterrent function by both encouraging settlement at an earlier time and discouraging a defendant from delaying litigation solely to make payment at a later time." *Old Orchard, supra* at

not reduce either the past or future economic damages and the plaintiff would be entitled to prejudgment interest on the full amount of the past noneconomic damages.

253. These purposes are accomplished under MCL 600.6013 by *increasing* the costs that a defendant will have to pay if the plaintiff prevails. Although these statutes appear to conflict, they can be construed together in a way that substantially preserves the purpose of each.

It must be noted that MCL 600.1483 does not limit all forms of compensation that a defendant may be required to pay after a verdict in favor of the plaintiff. The statute does not limit economic damages and does not purport to limit interest, attorney fees, or other costs. In contrast, MCL 600.6013 clearly requires compensation in the form of interest on the entire amount of the money judgment, which excludes future damages, but includes attorney fees and other costs. See MCL 600.6013(8). Thus, MCL 600.6013 has broader application than MCL 600.1483. Further, application of the cap provided by MCL 600.1483 directly and substantially affects the compensatory and deterrent effects of MCL 600.6013, while application of MCL 600.6013, which is based on the total damages, attorney fees, and costs, only indirectly affects the purpose of MCL 600.1483. Therefore, absent any guidance from the statutory language, I conclude that MCL 600.1483 should be construed in a way that minimizes its overall effect on a plaintiff's ability to receive the compensation required by MCL 600.6013. See *Denham v Bedford*, 407 Mich 517, 528-529; 287 NW2d 168 (1980) (examining a prior version of MCL 600.6013 and noting that the prejudgment interest statute is remedial and entitled to liberal interpretation).

In the present case, the trial court determined that plaintiff would not be entitled to prejudgment interest on the full amount of the capped noneconomic damages award. Instead, the trial court determined that plaintiff

would be entitled to interest on that portion of the capped damages equal to the ratio of past noneconomic damages to future noneconomic damages found by the jury. Applying this formula to the $371,800 noneconomic damages cap, the trial court concluded that $140,949.38 of the capped amount represented past noneconomic damages and $230,850.62 represented future noneconomic damages.

Although this solution appears equitable on its face, it is clear from its application that it significantly undermines the remedial purposes of MCL 600.6013. Future damages include damages for harm that a plaintiff will suffer during his or her remaining life. See *Rickwalt v Richfield Lakes Corp*, 246 Mich App 450, 469; 633 NW2d 418 (2001); MCL 600.6305(2). Further, future damages are reduced to a present cash value and payable with the judgment. MCL 600.6306(1). Hence, a plaintiff will invariably receive timely compensation for his or her future losses. In contrast, past damages reflect losses that the plaintiff has already incurred and for which he or she has not yet received any compensation. Yet, under the trial court's method, plaintiff would receive less compensation for the injuries she has already suffered solely on the basis that she would at some point in the future suffer further losses. Indeed, on this basis, the trial court more than halved the amount of interest to which plaintiff was entitled under MCL 600.6013(1) for her past damages. This method of applying MCL 600.1483 defeats the purpose of MCL 600.6013 without substantially furthering the purposes of the damages cap.

This problem can be avoided only by construing MCL 600.1483 in such a way as to minimize its effect on the application of MCL 600.6013. Hence, I construe MCL 600.1483(1) to reduce future noneconomic damages

before past noneconomic damages. Where the jury finds that the plaintiff has past noneconomic damages in excess of the applicable cap, as is the case here, the plaintiff will be entitled to prejudgment interest on the full amount of the applicable cap under MCL 600.6013(1). However, where the past noneconomic damages do not rise to the level of the applicable cap, the plaintiff will only be entitled to interest on the actual amount of the past noneconomic damages found by the jury. In this way, the plaintiff will be fully compensated for the losses already suffered.

For these reasons, I would conclude that the trial court erred when it concluded that plaintiff was only entitled to interest on a portion of the past noneconomic damages found by the jury. Therefore, I would vacate the award of interest and remand this case to the trial court for recalculation of the interest award consistent with my opinion.

IX. CONCLUSION

For the reasons stated, I would conclude that there were no errors warranting a new trial. However, I would conclude that the trial court erred when it determined that plaintiff was not entitled to prejudgment interest on the full amount of the capped noneconomic damages. Therefore, I would vacate the award of prejudgment interest and remand for recalculation of the interest consistent with this opinion. In all other respects, I would affirm.